927 A.2d 1194

**In re NICOLE B. and Max B.**

**No. 1378, Sept. Term, 2006.**

Court of Special Appeals of Maryland.

July 6, 2007.

Nenutzka C. Villamar (Nancy S. Forster, Public Defender, on brief), Baltimore, for appellant.

Kathleen E. Wherthey (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Panel EYLER, JAMES R., ADKINS, KENNEY,* JAMES A., III, JJ.

Opinion by ADKINS, J.

For the first time in a reported opinion in Maryland, we are called upon to interpret and apply the requirement in the Federal Indian Child Welfare Act that the Department of Social Services take "active efforts" during CINA proceedings to prevent the breakup of an Indian family. *See* 25 U.S.C. § 1912; Md.Code (1973, 2006 Repl.Vol.), § 3–801 *et seq.* of the Courts and Judicial Proceedings Article (CJP). John B. and Wendy B., appellants, are the parents of Max B. and Nicole B. After the children were found to be children in need of assistance (CINA), the Circuit Court for Montgomery County held a permanency planning hearing and ordered the plan changed from reunification with appellants, to placement with a paternal aunt for custody and guardianship. The CINA case was then closed. Appellants now ask us to conclude that the circuit court erred in closing the CINA case and failing to make "active efforts" to prevent the break-up of the family as required by the Federal Indian Child Welfare Act (hereinafter "ICWA"). We agree with appellants' contention that the court failed to properly address the "active efforts" requirement of the ICWA. Therefore, we vacate and remand for further findings consistent with the requirements of this Act.

## FACTS AND LEGAL PROCEEDINGS

Ms. B. is a Native American and a member of the Yankton Sioux Tribe. Max, born July 20, 1999, is a registered member of the Yankton Sioux Tribe. Nicole, born February 28, 2002, is eligible for membership, but is not currently a registered member of the Tribe. Mr. B. is not of Indian descent. Mr. and Ms. B. are married, and were separated at the time of the permanency hearing.

---

* Kenney, J. participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a retired, specially assigned member of the Court.

These proceedings began when the children were placed in shelter care by appellee, Montgomery County Department of Health and Human Services ("the Department"), on May 24, 2005, due to parental neglect. The original CINA petition detailed that:

> Nicole has not yet been toilet trained; Max's front teeth are rotten; Max refuses to eat at school; the family does not have a regular meal schedule; Max has asthma; and his mother does not know his treatment protocol.

Max and Nicole were found to be CINA by agreement of all parties on June 20, 2005. After the CINA declaration, the children were placed with their paternal aunt, Denise P. The Department's permanency plan was reunification with the parents. Thus, Mr. B. was ordered to participate in a substance abuse evaluation, submit to semi-weekly urinalysis, participate in regular psychiatric treatment, make efforts to maintain stable housing, and provide child support. Ms. B. was ordered to submit to a substance abuse evaluation, follow treatment recommendations, and submit to semiweekly urine screens. Mr. and Ms. B. were granted supervised visitation, and Mr. B.'s telephone calls were monitored by the Department.

The next review hearing was held on September 15, 2005. The court was informed that Mr. B. had obtained housing, and had been hospitalized to detox from the methadone prescribed to treat his Oxycontin addiction. Mr. B. was willing to enter an in-patient drug treatment program and undergo mental health treatment, but needed assistance with the cost, as he lost his health insurance coverage. Mr. B. had tested positive for cocaine and marijuana.

At the September 15 hearing, the court was also updated on Ms. B., who lacked housing, was unemployed, was not consistently visiting her children, and had not attended the court ordered substance abuse evaluation. Specifically, Ms. B. visited her children four times in three months, and appeared intoxicated during visitation. The Department indicated that there was no phone number at which Ms. B. could be reached,

and she appeared to be under the influence of alcohol when at the Department's offices.

At the end of the September 15 hearing, the B.'s were ordered to complete weekly supervised visitation, participate in substance abuse evaluation, twice weekly urinalysis, and secure and maintain stable housing and employment. Mr. B. was also ordered to participate in mental health treatment.

In November 2005, the Department gave Mr. B. an application for pharmacy assistance, and discussed mental health treatment with him. The Department explained to Mr. B. that he needed substance abuse treatment before he could receive a mental health evaluation. In December 2005, there was a review hearing held, and a representative from the Yankton Sioux Indian Tribe came from South Dakota to speak to the circuit court regarding the tribe's motion to intervene.

A permanency planning hearing was held on April 27, 2006. At this hearing, the Yankton Sioux Tribe was granted intervenor status, but its motion to transfer jurisdiction was denied. The Department and counsel for the children argued that the appellants had made minimal progress. The evidence showed that Mr. B. was unsuccessfully discharged from Avery Road Treatment Center, an inpatient drug treatment center, after three weeks.[1] Mr. B. was then referred to Addiction Services Coordination for an evaluation, which he did not attend.

Ms. B. attended and was successfully discharged from the inpatient drug treatment program at Avery Road. Avery Road then referred her to Another Way, an out-patient methadone treatment facility. She stated that she started this program, but it was costly, and "you have to get a ride there." Ms. B. testified that she enrolled in an abused persons program, attended AA meetings, and a bible retreat. She also stated that she participated in an Indian Education Program with her children, where they attended class twice each week for

---

1. Mr. B. had complied with the treatment plan, but was discharged because he was smoking a cigarette in his bathroom. He would have been discharged with successful completion of the program a few days later.

tutoring, computer education, Indian crafts, and holiday parties. Ms. B.'s testimony also reflected her tense relationship with Ms. P., the children's aunt and guardian. She said, "when I first had Max, and I lived in the basement, she was suffering from OCDC really bad. And, she used to come down in the morning and steal Max."

Ms. B. tested positive for benzodiazepine, cocaine, and an opiate on April 14, 2006. Ms. B. testified that she failed to see her children very often because she was "hiding." She said she was working four to ten hours a day in construction, but had little income because she was "paying off a tab" to a hotel, for Mr. B. She planned to get a government job at Indian Health Services. She was living with Mr. B.'s brother Tommy, in a home where Mr. B. lived on a different floor.[2] Mr. and Ms. B. each had a mix of positive and negative urine tests, and each had missed some of their urinalysis appointments.

At this April 27 hearing, Denise P. (paternal aunt), testified that the children were doing well. She said that Nicole is a "happy little girl," and that Max is reading on grade level, and has done "very, very well in math." Ms. P. testified that she does not work outside the home because she suffers from obsessive—compulsive disorder, and receives disability payments. She stated that she takes medication for this disability, which she has been treating for 12 years. Ms. P. also testified that Mr. B. is "a good father to his children."

The Department's social worker, Karen Crist, testified that the Department changed its permanency plan in November 2005, with the new plan placing custody and guardianship with Ms. P. Christ stated that since November 2005, she gave Mr. B. the application for pharmacy assistance and discussed mental health treatment with him.

---

**2.** Ms. B. also testified that before the children were taken out of her care (prior to May 2005), she had to remove the children from the home when Mr. B. was fighting. Ms. B. sought a protective order in 2002, and registered for an abused person's program, claiming that Mr. B. was going to kill her.

At this April 2006 hearing, Nicole's therapist, Allison Fellowes–Conly, was accepted as an expert in clinical social work and treatment of abused and neglected children. She testified that Nicole made "incredible improvement," as the girl changed from a "very afraid and guarded" child to an individual who trusted her caregivers. She stated that Nicole suffers from post-traumatic stress disorder, and her present symptoms include nightmares, disassociation, recurring memories of fights with her parents, and irritability. She summarized,

she's done incredible work, and she's more of a full child now. She's smiling. She's singing. She's dancing. Whereas before, she was extremely guarded and restricted.

Fellowes–Conly also testified that Max was coming along "very well" in his therapy. The therapist stated that Ms. P. was great to work with, and used the advice given to her right away. There was also testimony from Mr. B.'s brother, Vincent B., who said that he has noticed a tremendous change in the children since they were in Ms. P.'s care.

At the conclusion of the April 2006 hearing, the court changed the permanency plan from reunification with the parents to custody and guardianship with Ms. P. The court further ordered the parties to secure and maintain stable housing and employment, and participate in substance abuse treatment, twice weekly urinalysis and breathalyzers, parenting education, and psychological and psychiatric evaluations. The court decided to review the matter further in 90 days.

The next review hearing was held on July 21, 2006. Ms. B. was submitting to urine screens, but still had some positive test results showing illicit drug use. She missed nine scheduled urine and breathalyzer tests between May 18, 2006 and July 10, 2006. Her results were positive for benzodiazapine nine times, for opiates three times, and for cocaine once. On at least one date, Ms. B.'s urine tested positive for alcohol. Also, Ms. B. attended a parenting class two times, but was unable to fully focus during the sessions. Ms. B. produced documentation that she had been attending AA meetings. Ms. B.'s attorney also stated that her client had an emergency

tooth abscess, and was prescribed Vicodin for pain, which could account for some of the positive urines.

At this July hearing, Mr. B. did not seek custody of the children, but, instead, he supported Ms. B. having custody. The Department stated that Mr. B. did not attend the responsible fathers program. Mr. B. had spoken with the Department prior to the hearing, and stated that he saw many beer cans in the trash at Ms. B.'s residence, that she and his brother Tommy had been crushing and ingesting pills, and that his brother assaulted him. Mr. B. failed to appear for any of the mandatory urine or breathalyzer tests, provided no proof of employment, and had been kicked out of the rental unit he was living in.

In addition, the appellants were not referred for psychological and psychiatric evaluations, because neither party showed six consecutive negative urine screens. The Department had referred the parties to the Axcess program, to address mental health and substance abuse issues, but neither parent had attended.

The attorney for Nicole and Max agreed with the Department, and asked the case to be closed, stating that keeping the case open would "make things more unstable for the children." Also at this July hearing, an attorney for the Yankton Sioux Tribe testified that the Department had not made enough "active efforts", and was not in compliance with the Federal Indian Child Welfare Act.

At the close of the July 2006 permanency hearing, the court maintained the permanency plan of custody and guardianship to Ms. P., and closed the CINA case, terminating the court's jurisdiction, stating:

Both children demonstrate symptoms of experiencing trauma from when they were still in their parents' care. Neither parent is able to provide them with a consistent, stable and nurturing home environment to meet their needs. They need a sense of permanency[.]

The parents appealed, asking us to consider the following question:

Did the court err in closing the CINA case and terminating the court's jurisdiction where the Department failed to make active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the family, as required by the Federal Indian Child Welfare Act?

## DISCUSSION

### I. Motion To Dismiss

The Department argues that Ms. B. failed to file a timely notice of appeal. The parents claim to be appealing jointly, and have filed one appellants' brief together. The Department, however, contends that the docket entries show that only Mr. B. filed a timely notice of appeal.

The appeal is filed under the names "John, Wendy B.", and is signed by John B. Ms. B. filed no separate appeal. Although the Department argues that Ms. B. did not file a sufficient notice of appeal, the notice filed indicates the intent of both parties to appeal the circuit court's decision. The appellants are represented by the same counsel, and are making the same arguments. Therefore, we will view the notice of appeal as an appeal by both parties, and address its merits.

### II. Decision To Terminate Jurisdiction

### The Indian Child Welfare Act

Mr. and Ms. B. argue that the circuit court closed the CINA case in error, by failing to find that the Department made active efforts to prevent the breakup of the Indian family, as required by the ICWA. The pertinent section of the ICWA states:

§ 1912. Pending court proceedings

(a) Notice; time for commencement of proceedings; additional time for preparation

In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is

involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe. . . . of the pending proceedings and of their right of intervention. . . . No foster care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe or the Secretary[.]

\* \* \* \* \* \*

(d) Remedial services and rehabilitative programs; preventive measures

Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law **shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.**

(e) Foster care placement orders; evidence; determination of damage to child

No foster care placement may be ordered in such proceeding in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

25 U.S.C. § 1912 (emphasis added).

In Maryland, after a child is adjudicated CINA, a circuit court maintains jurisdiction until the child reaches twenty-one, unless the court terminates the case sooner. *See* CJP § 3–804(b). Here, the court terminated jurisdiction by closing the CINA case and awarding custody and guardianship to Ms. P., pursuant to CJP section 3–819.2. We must now determine if the court erred by violating the provisions of the ICWA when terminating jurisdiction.

## The ICWA's Application To This Case

The Department argues that the ICWA does not apply in this instance. We disagree. The statute defines "foster care placement" as:

> [A]ny action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated.

25 U.S.C. § 1903(1)(i). Here, Max and Nicole B. have been removed from their parents for placement in a home of a guardian, and Mr. and Ms. B. cannot "have the[ir] child[ren] returned upon demand." Therefore, the ICWA does apply to this case.

The Department also contends that it met the requirements of the ICWA, because it "neither sought nor obtained a foster care placement for Nicole and Max or a termination of Mr. B.'s and Ms. B.'s parental rights. Instead, the Department sought to place the children under their aunt's guardianship." Under the ICWA, an "extended family member" is "defined by the law or custom of the Indian child's tribe or, in the absence of such law or custom, shall be a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." 25 U.S.C. § 1903(2). We agree that Ms. P. qualifies as an "aunt" under this statutory definition. That does not mean, however, that closure of the CINA case was appropriate. The Department, in making its argument stated above, ignores that a preference for placement with extended family members is not triggered until active efforts have been made to prevent the breakup of the children's family.[3]

---

**3.** We are aware that in *In re Santos Y.*, 92 Cal.App.4th 1274, 112 Cal.Rptr.2d 692, 723 (2001), *review denied*, Feb. 13, 2002, the California court held that the ICWA's extended family doctrine was unconstitutional, because it was applied to "an individual who is in all respects,

## "Active Efforts" Requirement

 We must determine whether the Department made "active efforts" to reunify the Indian family, under 25 U.S.C. section 1912(d). The "active efforts" requirement is

> to be determined by the trial court, before the termination case may proceed. The state is required to make an affirmative showing, "to satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the break up of the Indian family and that those efforts have proved unsuccessful."

*In re H.J.*, 149 P.3d 1073, 1078 (Okla.Civ.App.2006) (citation omitted), *cert. denied*, Nov. 20, 2006.

 The determination of whether a social services agency has made "active efforts" to prevent family breakup under the ICWA is a mixed question of fact and law. *See E.A. v. Alaska Div. of Family and Youth Servs.*, 46 P.3d 986, 989 (Alaska 2002). In reviewing mixed questions of fact and law in Maryland, this Court will accept "factual findings unless clearly erroneous, but mak[e] its own determination whether the application of the law to that finding was 'legally correct.'" *L.W. Wolfe Enters., Inc. v. Md. Nat'l Golf, L.P.*, 165 Md.App. 339, 348, 885 A.2d 826 (2005) (citations omitted), *cert. denied*, 391 Md. 579, 894 A.2d 546 (2006). Here, the court did not specifically make factual findings regarding the ICWA, but did address the efforts that the Department made to reunify Mr. and Ms. B. with their children. At the final hearing on July 21, 2006, (at the conclusion of which the CINA case was closed), the following colloquy occurred:

> [Attorney for the Yankton Sioux Tribe]: The Indian Child Welfare Act, in Section 25 U.S.C. § 1902(d), I believe,

---

except in genetic heritage, indistinguishable from other residents of this state [and this] violates the Fifth, Tenth, and Fourteenth Amendments to the United States Constitution." *But see, e.g., In re Vincent M.*, 150 Cal.App.4th 1247, 59 Cal.Rptr.3d 321 (2007), rehearing denied June 11, 2007; *In re Adoption of Hannah S.*, 142 Cal.App.4th 988, 48 Cal.Rptr.3d 605 (2006). We express no opinion regarding this issue, as it was not raised in this case.

requires the Department to make active efforts. The Adoption and Safe Families Act, which is another Federal Congressional Act, that does provide funding to states through Title IV(e), funding by the, through the Social Security Act, requires states primarily to make reasonable efforts; and that is what the Department has presented to you in its report regarding its "reasonable efforts."

However, the Indian Child Welfare Act does require active effort. Active efforts are recognized by federal law to be applicable to native families, and active efforts require more than just the reasonable efforts that are alleged in the report by the Department.

I do note that on, I believe page 2, of the report, where there is, about halfway down, a section entitled "Reasonable Efforts to Achieve the Permanency Plan," that the Department is primarily engaged in monitoring of the placement, which is not actually a service to the parents, supervising the visitation between the parents and the children, and primarily providing a referral, referral to other sources, referral to parenting, referral to evaluations, referral to mental health treatment, et cetera. And referral is actually a passive activity, where a department tells parents this is where you can go, they hand them a card, it's someplace to go to, and says go do it. You've got this much time to get it done. That's not actually an active effort.

We do have a mother here who obviously has some issues that she has been dealing with, and the Tribe does believe that she has demonstrated some progress. It is true, and the Tribe also acknowledges, that Judge Algeo's finding of being relatively underwhelmed at the last hearing is correct. However, it does appear that even since that time, that the mother, at least—not to be confused with the father's situation—has made some additional progress that has been requested and ordered by the court.

The Tribe is also very concerned about the mother's apparent mental health condition. She does have a panic disorder, and this is recognized on page six of the Department's report. And there's also some illusion there where there is

a—the Department is alluding to a communication it had with the mother, who is saying she is even afraid to leave the house on occasion. Well when you're doing a passive effort, go get this help, handing someone a card, for example, and a person has got a panic disorder, is on medication, has apparently some medical issues as well, and is afraid to leave the house, how, really truly, can a native mother get that done?

 * * * * * *

Tribes typically come fairly late to these kinds of proceedings, just by the nature of how things go.

**THE COURT:** By nature of the fact that usually the parents have absolutely nothing to do with the Tribe, other than the fact that there's some type of lineal descendant. That's the reason. It's not like we have an active member in the Tribe that's in South Dakota, and is part of the Tribe, and happened to come in here and had a liaison with someone else and had a child. I mean, that's the reason the Tribe comes late to these proceedings. These women and fathers—in this particular case, as far as the County would know, would have no idea that they're part of the Tribe. I mean they're not active participants in the Tribe. And there's no indication their lifestyle indicates that she's part of the Tribe. I don't think she goes to tribal meetings, I don't think she's involved in any of these tribal celebrations you're talking about.

 * * * * * *

**THE COURT:** I had this case before Judge Algeo, and if she's a very active member of the Tribe, that's news to me.

**[Attorney for the Yankton Sioux Tribe]:** She's not required under federal law to—

**THE COURT:** I didn't say that she was.

**[Attorney for the Yankton Sioux Tribe]:**—be an active member of the Tribe.

**THE COURT:** I'm just indicating that how would we know? I could be a member of, say the Boy Scouts, but if I didn't tell anybody, no one would know.

**464**

[Attorney for the Yankton Sioux Tribe]: Right. The Indian Child Welfare Act imposes an affirmative duty on departments of social services of the different states to investigate, and to find out whether or not—

THE COURT: Right.

\* \* \* \* \* \*

THE COURT: Have they been out there? Is there anyone there that's had visitation with them? What's the Tribe going to do with them, other than come in here and say you didn't do everything you were supposed to do?

[Attorney for the Yankton Sioux Tribe]: One of the things that the Department needs to be doing and—

THE COURT: Forget the Department. They're doing everything wrong. What is the Tribe recommending be— what is this great Tribe going to do for these children? That's what I want to know.

[Attorney for the Yankton Sioux Tribe]: I object to your language, sir.

THE COURT: Well I object to you objecting, because all I'm hearing is indictments of our system, ma'am.

[Attorney for the Yankton Sioux Tribe]: No.

THE COURT: Yes. You haven't said one positive thing. We haven't done one thing right, here in the state court, as far as you're concerned, or the Tribe is concerned.

What I'm saying is what is the Tribe doing for these children, now that they know there is a, that they're part of a tribe where there is a lineal connection? That's what I'm asking you? Because we're looking at the best interests of the children.

\* \* \* \* \* \*

[Attorney for the Yankton Sioux Tribe]: That's why I'm here today. And so the Tribe is specifically recommending that it be allowed to continue with discovery, to see more of what's happening in the file, to work with the Department of Social Services to do a relative search for relatives at the reservation, and to discuss with the aunt ways in which she

can, and should, and must, under federal law, assist these children in maintaining contact with the Tribe.

Sir, there's a long history of tribes, tribal members relocating to urban areas for things like employment. It's my understanding that the mother in this case, who is a tribal member, did, in fact, relocate to this area, and was working with the Indian Health Service[.]

Rockville, Maryland is a center for, a federal center for Indian health issues, and apparently that's why the mother is here. Tribes and tribal members are not limited in their rights, in regards to have to, just stay home, to be, to have and exercise your rights. We go all over the place, and rights follow us because we are citizens of our tribal nations. The—

**THE COURT:** So you want a relative search, that these children may have relatives within the Tribe?

**[Attorney for the Yankton Sioux Tribe]:** Yes.

\* \* \* \* \* \*

**THE COURT:** And what I'm telling you is I'd be happy to look at other possibilities, but I only have basically two choices. People are asking me now to close the case and leave the children with their aunt; or keep the case open and leave the children with their aunt.

I mean, those are the only things that anyone is asking me for, would you agree? You're saying keep it open because I haven't had, completed discovery, which I don't know exactly where that's going to take us. And you're saying keep it open, because the County hasn't provided themselves, they don't have the internal programs at their offices to deal with the mother and father's problem, and, number three, the County hasn't done a sufficient relative search within the Tribe. So I'm trying to address those three issues.

Number one, I don't fault the County for not finding a relative. It sounds that they, the Tribe has been on notice, the County has looked into that and there is no one that's come forward saying, I am a Tribe relative of this child and I'd like to be part of this child's life. More importantly,

even if someone is out there, they've obviously had no contact with these two children, which is significant.

Number two, the discovery that you would get, I don't know what that would lead to with respect to assisting the children at this point in their placement. Their files are pretty open. You have everything the other attorneys would have.

The court and counsel then continued, addressing the sufficiency of the Department's efforts in aiding the B. family:

**THE COURT:** And as far as the County not being able to provide the service themselves, but directing it, that's for the legislature because they don't, it's not like they have the psychiatrist on call in their building and they're purposely telling mom to go somewhere else. This is the way that they operate. They provide the services, they let them know where the programs are and then the parents either show up or they don't, or they get something out of it or they don't.

**[Attorney for the Tribe]: Well then if that's the case, then I think it's actually a matter that the Department is not complying with the Indian Child Welfare Act that requires active efforts.**

**THE COURT: Well, I guess it's question of—**

**[Attorney for the Tribe]: Now the Department—**

**THE COURT:—definition of active effort. I don't agree with your definition. I think you can be active. I think, for example, a school principal at an elementary school can be active in recommending to a parent that the child go see a child psychiatrist. I don't think the school has to have a psychiatrist, you know, on their staff, and that's still being active.**

**[Attorney for the Tribe]: Well, the school is not held to the IQUA [sic] standards. It's just in child custody proceedings in court.**

**THE COURT: Analogy. What I'm saying is they don't necessarily have to have the parenting program conducted by themselves—**

**[Attorney for the Tribe]: Well—**

THE COURT:—if, in fact, they have a reputable one.

[Attorney for the Tribe]: It's a false analogy, I'm sorry, because the IQUA [sic] doesn't—

THE COURT: Well I disagree.

[Attorney for the Tribe]: IQUA [sic] doesn't apply to them.

THE COURT: All right. You may proceed.

[Attorney for the Tribe]: One last thing I would like to bring up, in terms of the active efforts is, that it's my understanding that a benzodiazepine is essentially what Xanax is and Xanax is a—

THE COURT: I don't know and I'm not going to accept that unless—

[Attorney for the Tribe]:—prescription—

THE COURT:—do you have a psychiatrist or a pharmacist or someone else to testify? Because unless we have a medical person in here, I'm not accepting yours or anyone else's definition of those drugs. I just don't know. I don't think anyone is qualified here, unless you want to try and have somebody call you as a witness and qualify you. I just can't accept that. You know that. You're a lawyer.

[Attorney for the Tribe]: Sure. Well, and I was a mental health professional. I'm a licensed professional counselor in Miami.

THE COURT: Well you may qualify, but you have to give up your role as the advocate here then.

[Attorney for the Tribe]: Well my concern though, in terms of that, is that if a mother's prescribed medication, part of which shows up on a UA to make her dirty, and she's taking that medication for a mental health disorder that the Department recognizes exists, and she can't get treatment for that mental health disorder until she has clean urines, do you see what I'm saying, it's a whole

conundrum about the panic disorder that I don't think has been adequately addressed.

(Emphasis added.)

The circuit court filed a written order, finding that "[r]easonable [e]fforts have been made by the Montgomery County Department of Health and Human Services (hereinafter the 'Department') to achieve Reunification with the Child's parents as listed on page 2 of the Department's report dated July 12, 2006[.]" The court did not mention the ICWA in this written order. It attached the portion of the Department's report detailing the following reasonable efforts:

1. Monitor the children's placement with their aunt, Denise [P.]

2. Supervised visitation for Max and Nicole [B.] with their father.

3. Supervised visitation for Max and Nicole [B.] with their mother.

4. Met with both parents to discuss their lack of progress towards reunification.

5. Met with both parents to discuss service agreements.

6. Referred John [B.] for substance abuse evaluation.

7. Referred John and Wendy [B.] for urinalysis.

8. Monitor urinalysis results.

9. Collaborated with the children's therapists at the Lourie Center.

10. Referred Wendy [B.] for parenting education on June 7, 2006.

11. Referred Wendy [B.] for parenting education with Julia Abaijan–Kirvan.

12. Referred John [B.] for parenting education with Patricia Ferreira.

13. Referred John [B.] to Axcess for mental health treatment.

14. Referred Wendy [B.] to Axcess for mental health treatment.

15. Conducted home visit with Wendy [B.].

**The Difference Between "Reasonable Efforts" And "Active Efforts"**

The Department was required by Maryland statute to conduct reasonable efforts for reunification. *See* Md.Code (1984, 2006 Repl.Vol.), § 5–525(d) of the Family Law Article (FL). Additionally, in 1998, Maryland implemented the federal Adoption and Safe Families Act (hereinafter "ASFA"). *See In re Karl H.*, 394 Md. 402, 419, 906 A.2d 898 (2006). As the Court of Appeals explained,

> Generally, the Act is designed to promote the adoption of children in foster care. To that end, the Act provides that a child's health and safety are paramount in determining whether reasonable efforts to preserve the family had been undertaken. In addition, the Act makes it easier to remove a child from [an] abusive family and speed up the adoption process.

> Specifically, as to the provision that pertains to concurrent permanency plans, the Act essentially shortens the period for reunification, because the "Act usher[s] in a requirement of concurrent planning under which the government must simultaneously provide parents assistance to reunify with their children and to prepare for permanent placement for dependent children should reunification fail."

*Id.* at 421 n. 15, 906 A.2d 898 (citation omitted).

Mr. and Ms. B. now argue that "reasonable efforts" were insufficient, and the court erred in closing the children's CINA case when no showing was made to satisfy "active efforts" under the ICWA. The ICWA does not define "active efforts," and no case law in Maryland has previously addressed this issue. The Supreme Court of South Dakota discussed the differences between the ICWA and the ASFA:

> ICWA differs from ASFA in its means of promoting Indian children's best interests. ICWA ensures the best interests of Indian children by maintaining their familial, tribal, and cultural ties. It seeks to prevent capricious severance of those ties, whereas ASFA identifies permanency as a major consideration in promoting the best interests of children. A

further distinction between the two acts .... is the requirement in ICWA that state agencies make "active" efforts to provide services aimed at the prevention of a family break-up. ICWA provides no exception to this mandate. On the other hand, in an attempt to assist states in increasing the speed with which children might achieve the desired goal of permanency.... ASFA relieves states from making merely perfunctory remedial efforts in cases where a court has found that the parent has subjected the child to aggravated circumstances of abuse or neglect.

*People ex rel. J.S.B., Jr.*, 691 N.W.2d 611, 617 (S.D.2005).

The South Dakota court concluded that the ASFA does not override the ICWA:

If it is perhaps open to question whether our Legislature understood the terms "reasonable efforts" and "active efforts" to be interchangeable, we do not think Congress intended that ASFA's "aggravated circumstances" should undo the State's burden of providing "active efforts" under ICWA. Three rules of statutory construction dictate otherwise. First, ICWA clearly offers no exception to its requirement of "active efforts." And ASFA does not mention ICWA, much less state that its exceptions to "reasonable efforts" should apply to ICWA's "active efforts." In fact, no provision in ASFA specifically purports to modify ICWA. It would seem illogical that ASFA would implicitly leave unchanged certain ICWA provisions, like notice to tribes, intervention, and transfer to tribal courts, while modifying others.

Second, the rules of statutory construction require that the more specific statute controls. As between the two acts, ICWA is the more specific. ICWA deals with a discrete segment of our population, Native American families, who Congress found were best served by maintaining their relationships with their tribes and extended families[.]

\* \* \* \* \* \*

Third, when interpreting a statute pertaining to Indians, the United States Supreme Court has stated, "statutes are to be

construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit...." As Congress found when it enacted ICWA, it is to the benefit of Indian children to remain within their families and only after "active efforts" to reunite those families have proven unsuccessful should the children be removed.

*Id.* at 619 (citations and footnote omitted).[4]

Definitions of "active efforts" under the federal statute vary by state, and what constitutes "active efforts" is usually fact specific. The majority of courts that have considered the "active efforts" requirement, however, have determined that it sets a higher standard for social services departments than the "reasonable efforts" required by state statutes. *See In re Welfare of Children of S.W.,* 727 N.W.2d 144, 150 (Minn.Ct. App.2007), *review denied,* Mar. 28, 2007 (Minnesota Tribal/State Indian Child Welfare Agreement defines the term "active efforts" as "thorough, careful, and culturally appropriate efforts"); *Winston J. v. State, Dept. of Health and Soc. Servs., Ofc. of Children's Servs.,* 134 P.3d 343, 347 n. 18 (Alaska 2006)(stating that the ICWA's "active efforts" requirement is more demanding than the "reasonable efforts" required by the state statute); *In re Interest of Dakota L.,* 14 Neb.App. 559, 712 N.W.2d 583, 594 (2006)(recognizing that the "active efforts" provision in the state's ICWA is "separate and distinct" from the "reasonable efforts" in the state statute); *In re A.N.,* 325 Mont. 379, 106 P.3d 556, 560 (2005)(determining that "[t]he term active efforts, by definition, implies heightened responsibility compared to passive efforts. Giving the parent a treatment plan and waiting for him to complete it would constitute passive efforts").

---

**4.** In *People ex rel. J.S.B., Jr.,* 691 N.W.2d 611, 620 (S.D.2005), the Supreme Court of South Dakota did not remand the case to the lower court for findings of fact regarding "active efforts," because South Dakota appellate courts examine mixed questions of fact and law *de novo.* We review mixed questions of fact and law under a different standard. *See supra,* section II.

We are persuaded that the cases cited in the previous paragraph properly interpreted the ICWA in holding that the "active efforts" standard requires more effort than a "reasonable efforts" standard does. We emphasize, however, that the requirement of "active efforts" does not require "futile efforts." In an ICWA case, the South Dakota Supreme Court affirmed a termination of parental rights, after several years of efforts by the Department:

> Under ICWA, DSS was bound by law to make "active efforts" to reunite J.S.B. with his father, but it was not required to persist with **futile efforts.** Considering that DSS worked with the parents for several years, that J.S.B. had been removed from their custody three times because of substance abuse related neglect, that the child has been in foster care for much of his life, and that both parents continued their debilitating substance abuse, termination of parental rights was the least restrictive alternative available and in the best interests of J.S.B.

*People ex rel. J.S.B., Jr.,* 691 N.W.2d at 621 (citation omitted and emphasis added).[5] In contrast, here, the B. children were only removed once, and the Department's permanency plan was changed from reunification with the parents to custody with another relative after only 6 months of Department intervention.

Moreover, there were alleged reasons why the B.'s could not participate in the programs recommended by the Department. Ms. B. testified that she could not attend the recommended

---

5. *In re A.N.,* 325 Mont. 379, 106 P.3d 556, 561 (2005), is another case in which the court held that more active efforts were futile, stating:
 > [The Department] held two family group decision-making meetings and the Department paid for Father's sex-offender evaluation. Although [the Department] arranged a good-bye visit before the children moved to North Dakota to live with relatives for a while, Father failed to appear. Between December 2002 and September 2003, Father disappeared except for one visit [with the Department] to try to talk to his children.
 >
 > With Father so completely unavailable, [the Department] could not have been more active. Father left her no phone number and no address and moved between multiple residences. The Department's efforts were as active as possible.

"Another Way" methadone treatment program because she could not afford $300 a month, the cost of the program. Not only did Ms. B. have a panic disorder, but the testimony revealed that Mr. B. suffers from bipolar disorder. The B.'s could not receive the necessary mental health evaluations because, under the Department's policy, mental health treatment was not offered until parents conquered their substance addictions. In this case, we think that it was necessary for the Court to consider if the Department sufficiently addressed the B.'s mental disorders in deciding what "active efforts" were required. On remand, the court may wish to consider Ms. B.'s testimony that she enrolled in an abused persons program, attended AA meetings, participated in an Indian Education program with her children, and successfully attended an in-patient drug treatment program.

We do not know exactly what additional services the Department could have provided. It may have been able to identify funds to help pay for the "Another Way" methadone treatment, or offer other assistance to Ms. B. to deal with her substance abuse problem. Quite possibly, the "active efforts" standard, under these circumstances, would require the Department to do more than just recommend a program. The "active efforts" standard may also have required that the Department facilitate Ms. B.'s visitations with her children, which she said she could not make because she "was hiding" in her house, possibly due to her panic disorder, by having a social worker accompany her when she leaves her home for the visits.

Whether additional steps are required will depend not only on the particular facts of the case, but on what resources the Department has, a matter not addressed in this record.[6] The

---

6. Interestingly, the circuit court at one point suggested that the Department find financial support for Mr. B.'s mental health treatment. The court stated, "I'll order that he participate in mental health treatment, including medication management if he is financially able to, or if the Department arranges, is in a position to arrange the treatment that he can afford, or that he will not have to pay for."

burden is on the Department to demonstrate that a lack of resources prevented it from making more active efforts on her behalf. *See* 25 U.S.C. § 1912(d).

In relation to the "active efforts" standard, the circuit court said only that:

> I guess it's a question of—definition of active effort. I don't agree with your definition. I think you can be active. I think, for example, a school principal at an elementary school can be active in recommending to a parent that the child go see a child psychiatrist. I don't think the school has to have a psychiatrist, you know, on their staff, and that's still being active.

Indeed, the circuit court appeared to equate the "active efforts" standard with a "reasonable efforts" standard.

We think the Supreme Court of Alaska's explanation of what constitutes "active efforts" better reflects the legislative purpose of the ICWA.

> [W]e cited the distinction between "active efforts" and "passive efforts" drawn by Craig J. Dorsay, *The Indian Child Welfare Act and Laws Affecting Indian Juveniles Manual* 157–58 (1984). According to Dorsay, passive efforts entail merely drawing up a reunification plan and requiring the "client" to use "his or her own resources to[ ] bring [ ] it to fruition." Dorsay at 157–58. Active efforts, on the other hand, include "tak[ing] the client through the steps of the plan rather than requiring the plan be performed on its own." *Id.*

*A.M. v. Alaska,* 945 P.2d 296, 306 (Alaska 1997).

### Summary

For the foregoing reasons, we vacate the closure of the B.'s CINA case, and remand for further proceedings consistent

---

But, the Department apparently never did so. At the April permanency hearing, the Department was asked what it had done to "arrange affordable treatment," and the caseworker said "I gave him the application for the pharmacy assistance program, and I encouraged him to get involved in substance abuse treatment so that we could further assist him in reaching the mental health treatment goals."

with this opinion. On remand, the circuit court, in determining if it should retain jurisdiction, should evaluate whether, in light of all the circumstances and resources reasonably available to the Department, the latter made sufficient active efforts to facilitate and provide treatment for the B.'s, in light of their mental health disorders.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY VACATED. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.**