976 A.2d 1039

**In re NICOLE B. and Max B.**

**No. 73, Sept. Term, 2007.**

Court of Appeals of Maryland.

July 28, 2009.

34

36

Kathleen E. Wherthey, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore), on brief, for petitioners.

Robert S. Bokman, Rockville, for petitioners.

Michael R. Braudes, Asst. Public Defender (Nancy S. Forster, Public Defender and Nenutzka C. Villamar, Asst. Public Defender, Baltimore), on brief, for respondent.

Lisa F. Cook, Rapid City, SD, brief of Intervenor Yankton Sioux Tribe of South Dakota amicus curiae, for Intervenor Yankton Sioux Tribe.

Raymond Cournoyer, Director, Indian Child Welfare Program, Marty, SD, brief of Intervenor Yankton Sioux Tribe of South Dakota amicus curiae, for ICWA Program, Yankton Sioux Tribe.

Argued before BELL, C.J.,*RAKER, HARRELL, BATTAGLIA, GREENE, JOHN C. ELDRIDGE (Retired, Specially Assigned) DALE R. CATHELL (Retired, Specially Assigned), JJ.

JOHN C. ELDRIDGE, J., Retired, Specially Assigned.

This Child in Need of Assistance ("CINA") case concerns a requirement in the federal "Indian Child Welfare Act of 1978," 25 U.S.C. § 1912(d), which provides as follows (emphasis added):

> "Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that *active efforts* have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."

The Circuit Court for Montgomery County ordered that the paternal aunt of two Native American children, who are brother and sister, "shall have full care, custody and guardianship of the" children, "that the parents shall have reasonable visitation with" the children "under the supervision of the

---

* Raker, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, she also participated in the decision and adoption of this opinion.

paternal aunt," and that the CINA "case be and hereby is closed."

The case presents two issues regarding the merits of the Circuit Court's judgment. The first is whether the requirement of "active efforts" to prevent the breakup of the family, under the federal statute, is essentially the same standard as the "reasonable efforts ... to preserve and reunify families" set forth in Maryland Code (1999, 2006 Repl. Vol., 2008 Supp.), § 5-525(d) of the Family Law Article. The second issue is, regardless of the similarity or dissimilarity between the federal and state standards, whether the Montgomery County Department of Health and Human Services did in fact make "active efforts" to prevent the breakup of the Indian family and those efforts were unsuccessful. A procedural issue, concerning the proper parties to this appellate litigation, is also raised. We shall hold that the father of the two children is a proper appellant-respondent in these appellate proceedings, and that, therefore, we shall be able to reach the merits of the case. We shall also hold that the Department of Health and Human Services did in fact make "active efforts" to prevent the breakup of the family and that those efforts were unsuccessful. Consequently, we need not, and shall not, decide whether the federal and state standards are the same.[1]

---

1. Cases in other jurisdictions seem to be divided on this issue. Opinions holding that the federal "active efforts" standard is essentially the same as the "reasonable efforts" to "preserve or reunify families" standard utilized in numerous state statutes include, *e.g.*, *Adoption of Hannah S.*, 142 Cal.App.4th 988, 998, 48 Cal.Rptr.3d 605, 612 (2006); *In re S.B.*, 130 Cal.App.4th 1148, 1165, 30 Cal.Rptr.3d 726, 736 (2005); *In the Interest of K.D.*, 155 P.3d 634, 637 (Colo.App.2007), *cert. denied*, 2007 WL 887679, 2007 Colo. LEXIS 249 (Colo.2007); *In re Noah B.*, 2005 WL 648058, 2005 Conn.Super. LEXIS 459 (Conn.Super., 2005). *See also Long v. State of Alabama, Department of Human Resources*, 527 So.2d 133, 135–136 (Ala.Civ.App., 1988).

Cases taking the position that "active efforts" under the federal statute requires more than "reasonable efforts" include, *e.g.*, *Winston J. v. State of Alaska, Department of Health and Social Services*, 134 P.3d 343, 347 n. 18 (Alaska 2006) (dicta, as the children were not Native American and the federal statute was inapplicable); *In the Interest of J.S.B., Jr.*, 691 N.W.2d 611, 619 (S.D.2005). *See also In the Matter of H.J.*, 149 P.3d 1073, 1074 (Okla.Civ.App.2006) (The Court recognized

## I.

The mother of the minor children involved in this CINA case, Wendy B., is a Native American and a registered member of the Yankton Sioux Tribe of South Dakota, although she was not raised within the Tribe but was raised by non-tribal adoptive parents. The children are Max B., born on July 20, 1999, and Nicole B., born on February 28, 2002. Max B. is a registered member of the Tribe, and Nicole B. is eligible for membership in the Tribe.[2] The children's father, John B., is not a Native American.

The Child Welfare Services Office of the Montgomery County Department of Health and Human Services, on April 6, 2005, received a report that Max B. and Nicole B. were being neglected by their parents.[3] The Department, upon investigation, discovered that Nicole, then age 3, had not been toilet trained, and that Max, then age 5, had rotten front teeth, refused to eat at school, and had asthma that his mother did not know how to treat. In addition, the family had no regular meal schedule at home. The Department's investigation dis-

the wording difference between the federal and the state statutes but did not discuss whether the reunifying standards are actually different; instead, the legal issue in the case concerned the degree of proof).

There are other states in which state law is worded the same as the federal Indian Child Welfare Act of 1978, namely requiring "active efforts," regarding Native American children, as a matter of state law. Thus, no issue concerning the possible difference between "active efforts" and "reasonable efforts" arises in those states. *See, e.g., In the Matter of the Welfare of the Children of S. W.*, 727 N.W.2d 144, 149–150, (Minn.App.2007), *review denied,* 2007 Minn. LEXIS 196 (Minn.2007) (State law required both "active efforts" and "reasonable efforts"); *In the Matter of A.N. and M.N.*, 325 Mont. 379, 384, 106 P.3d 556, 560 (2005); *In re Interest of Dakota L.*, 14 Neb.App. 559, 572–575, 712 N.W.2d 583, 593–595 (2006).

**2.** The Indian Child Welfare Act of 1978 defines an Indian child as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4).

**3.** Hereafter, the Child Welfare Services Office and the Montgomery County Department of Health and Human Services will, collectively, be referred to as the "Department."

closed that both parents had struggled with drug addiction for many years. The Department was also told by John B. that he was dependent on the drug oxycontin and that he suffered from bi-polar disorder.

On May 18, 2005, John tested positive for numerous drugs. Subsequently, the Department learned that, on May 19, 2005, Wendy B. began a "crack cocaine binge," and the next day she left home with another man, leaving the children alone with John. Wendy continued the "crack cocaine binge" and, as of May 24, 2005, she had not returned home. During Wendy's absence, John was observed falling asleep while smoking, causing burn-holes to furniture, and was unable to care for the children.

The Department on May 23, 2005, placed the children in emergency shelter care. The Department's staff met with John B. on May 24, 2005, and he acknowledged that he was unable to meet his children's needs. Also on May 24, 2005, the Department filed in the Circuit Court for Montgomery County a CINA petition. The Circuit Court ordered continued shelter care for the two children and granted John visitation with the children up to six times a week. The children were placed in the temporary custody of their paternal aunt, Denise P.[4]

---

4. The children's placement in out-of-home protective care under the auspices of the Department began a process under Maryland law in which the court is required to establish a permanency plan for the children and to review that permanency plan at least once every six months until the children's commitment to the Department is rescinded. *See* Maryland Code (1974, 2006 Repl. Vol., 2008 Supp.), § 3–823 of the Courts and Judicial Proceedings Article. Subsection (e) of § 3–823 requires that the permanency plan be consistent with the best interests of the children, and it gives the court several options. Subsection (e) provides as follows:

"(e) *Determinations to be made at hearing.*—(1) At a permanency planning hearing, the court shall:

(i) Determine the child's permanency plan, which, to the extent consistent with the best interests of the child, may be, in descending order of priority:

1. Reunification with the parent or guardian;

2. Placement with a relative for:

A. Adoption; or

Prior to May 2005, Wendy B., John B., and the two children lived with John's mother in a house owned by the mother. John's mother, however, was terminally ill and died in early May 2005. John, on May 24, 2005, informed a Department social worker that "he will be losing the house as it will be sold in the settlement of his mother's estate and he has not found another place for the family to live." The house was sold in early August 2005, and John left the house.

In early June 2005, Wendy B. contacted one of the Department's social workers assigned to the case and informed the social worker that she had quit her job, that she and John had separated, and that she would be staying with John's brother, Tommy, who, according to the record, was an alcoholic. Wendy also stated that she wanted to "live off the inheritance," apparently referring to the fact that John's and Tommy's mother had recently died. Wendy refused to tell the social worker where she was living at that time. The social worker told Wendy that there would be a Circuit Court adjudicatory hearing on June 20, 2005.

At the June 20, 2005, Circuit Court hearing, all of the parties who were present entered into an agreement with respect to the facts and the recommendations to be made to the court. The agreement was incorporated in the CINA petition as an amendment. Both children were represented at

---

B. Custody and guardianship under § 3-819.2 of this subtitle;

3. Adoption by a nonrelative;

4. Custody and guardianship by a nonrelative under § 3-819.2 of this subtitle; or

5. Another planned permanent living arrangement that:

A. Addresses the individualized needs of the child, including the child's educational plan, emotional stability, physical placement, and socialization needs; and

B. Includes goals that promote the continuity of relations with individuals who will fill a lasting and significant role in the child's life; and

(ii) For a child who has attained the age of 16 years, determine the services needed to assist the child to make the transition from placement to independent living.

(2) In determining the child's permanency plan, the court shall consider the factors specified in § 5-525(e)(1) of the Family Law Article."

the hearing by a court-appointed attorney. John was represented by his attorney and was personally present during the first part of the proceedings. Although John had to leave early, he did personally concur in the agreement which had been reached. Wendy was not present at the June 20th hearing, either in person or by an attorney.[5] The children's paternal aunt, Denise P., was present and responded to questions from the court.

In accordance with the parties' agreement, the Circuit Court on June 20, 2005, sustained all of the Department's allegations, found that the children "have been neglected by their parents, and ... the parents are unable and unwilling to give the children the proper care and attention that they need." The court determined that Max B. and Nicole B. were children in need of assistance.[6] The court further committed the children "to the Department and place[d] them under the jurisdiction of th[e] court, and place[d] them with their aunt," Denise P. Denise was also made a "limited" guardian of the children "for medical and educational purposes."

Since the Department's permanency plan for the children was reunification with a parent, the Circuit Court at the June 20, 2005, hearing imposed various requirements. The children were to "be supervised, under the direction of the Department, at a minimum weekly." Wendy's visitation with the children was to "be under the direction of the Department,

---

5. A few days before the June 20, 2005, hearing, Wendy telephoned one of the Department's social workers and told the social worker that she "had met with an attorney who possibly was going to represent her" at the June 20th hearing.

6. Maryland Code (1974, 2006 Repl. Vol.), § 3–801(f) and (g) of the Courts and Judicial Proceedings Article states as follows:
 "(f) *Child in need of assistance.*—'Child in need of assistance' means a child who requires court intervention because:
 (1) The child has been abused, has been neglected, has a developmental disability, or has a mental disorder; and
 (2) The child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs.
 "(g) *CINA.*—'CINA' means a child in need of assistance."

minimum weekly, and supervised by the Department." Wendy, however, would not be allowed to visit the children if, with respect to a particular visit, she was not sober. Wendy was also required to "submit to a substance abuse evaluation and follow all treatment recommendations." In addition, the court ordered that she "participate in semi-weekly urine screens and remain substance free."

Similar requirements were imposed upon John. He was ordered to participate "in a substance abuse evaluation under the direction of the Department" and to undergo semi-weekly urinalysis with "urine screens." The Department was to coordinate with the "Another Way Treatment Center" where John was receiving, as an outpatient, methadone treatment for his oxycontin addiction, and to develop a treatment plan. John was ordered to "secure and maintain stable housing" for the family, as he would not be able to remain in his mother's house after it was sold. He was also directed to continue his treatment with a psychiatrist who was then treating him. In addition, John was told to report "to the Office of Child Support Enforcement" for the purpose of establishing a support order for both children. John's visitation with the children was to be supervised under a plan to be worked out by the Department and Denise P.

During the summer of 2005, the Department presented to John and to Wendy a "Case Plan for Children in Out–of–Home Care." John and Wendy each signed their case plans. Both case plans set forth the reasons causing the children to be placed in the Department's care, the goal of reunifying the children with their parents, and a list of "tasks" for the parents with a time frame, such as addressing substance abuse issues and maintaining safe and stable housing.

In addition to the June 20th hearing, there were four other review hearings in this case: September 15, 2005, December 19, 2005, April 27, 2006, and July 21, 2006. Before each hearing, the Department prepared a "Review Report" outlining the Department's interactions with the parents and the progress made by each parent.

Between the June 20, 2005, hearing and the court hearing scheduled for September 15, 2005, Wendy apparently informed a Department social worker that Max was registered with the Yankton Sioux Tribe of South Dakota, and the Department notified the Tribe of the CINA case. Several months later, the Tribe filed a motion to intervene and a separate motion to transfer jurisdiction to the Yankton Sioux Tribal Court. The Circuit Court granted the motion to intervene but denied the motion to transfer jurisdiction.

In a "Review Report" prepared by the Department in September 2005, in connection with the September 15, 2005, court hearing, the Department reiterated that the Permanency Plan for Max and Nicole was reunification with a parent. The Department listed numerous efforts which it had made to achieve the Permanency Plan.[7] The Review Report also dealt with the progress made by John, Wendy, and the two children. In early July 2005, a social worker visited John at his mother's house and left for John and Wendy court orders, "letters regarding their lack of progress towards reunification, referrals for substance abuse evaluation and urinalysis, and service agreements." Although Wendy was not present, she later stated that she had received the documents.

According to the Review Report, John had ten scheduled visits with the children between June and September 2005, but he failed to show up on six of the dates. With regard to the four dates when he did visit the children, he would make promises to them which he failed to keep, such as promising Max a birthday present. John had not attended the "Another Way Treatment Center" since July 17, 2005. On August 24,

---

7. The list of efforts included the following:
"1. Explore options for relative placement.
2. Monitor the children's placement with the aunt, Denise P.
3. Supervised visitation for Max and Nicole B. with their father.
4. Supervised visitation for Max and Nicole B. with their mother.
5. Provided transportation for the children to and from visitation.
6. Met with both parents to discuss service agreements.
7. Referred John and Wendy B. for substance abuse evaluations.
8. Referred John and Wendy B. for urinalysis.
9. Monitor urinalysis results."

2005, John agreed to submit a urine sample, and the sample tested positive for cocaine and marijuana. The Department at times found it difficult to contact John. Although he continued to live in his mother's house until early August 2005, the telephone was disconnected in early July; thus, when John would telephone a social worker and leave a message, the social worker would be unable to return the call. Apparently near the end of the June 20 to September 15 period, John informed a social worker "that he took a loan off his inheritance and was able to rent a place to live." He also gave Denise P. $1200 for child support.

The Department's lack of success with Wendy was compounded by the difficulty in reaching her. On one occasion when a social worker was able to speak with her, Wendy stated "that she did not have a job, permanent residence and a phone number where she could be reached." During the period covered by the Review Report, Wendy would call the Department and leave messages cancelling appointments with a social worker, but the social worker was unable to call her back because Wendy had no telephone. At a meeting with a social worker which did take place on August 22, 2005, Wendy's eyes were bloodshot, she slurred her words, and "it was difficult to understand her reasoning." At a scheduled visitation with the children on August 25, 2005, Wendy arrived late and was under the influence of drugs and alcohol. Wendy admitted that a urine test would be positive, and she informed the social worker that she had taken valium just before the meeting. Wendy stated that she washed the valium down in an orange drink which contained vodka. Wendy had been referred to "Addiction Services Coordination (ASC)" for substance abuse evaluation and urinalysis, but, as of the date of the Review Report, she had not attended ASC.

The Review Report stated that the children were "thriving in their current placement," that "[b]oth children are obviously bonded to their aunt," that Denise P. was taking Max to a dentist because of his decaying front teeth, that Max was taking swimming lessons, and that the children had enjoyed a one-week vacation at the beach. The Department's recom-

mendations in the September 2005 Review Report were as follows:

### *"RECOMMENDATIONS:*

"The Department respectfully recommends that:

"1. Max and Nicole B. remain committed to the Department under the jurisdiction of the Court.

2. Max and Nicole B. remain in placement with their aunt, Denise P.

3. Visitation between Max and Nicole and their father, John B., be supervised once a week under the direction of the Department.

4. Visitation between Max and Nicole and their mother, Wendy B., be supervised once a week under the direction of the Department.

5. John B. participate in a substance abuse evaluation and follow all recommendations.

6. John B. participate in urinalysis twice a week.

7. John B. secure and maintain stable housing and a means of support for his children.

8. John B. participate in mental health treatment, including medication management.

9. Wendy B. participate in a substance abuse evaluation and follow all recommendations.

10. Wendy B. participate in urinalysis twice a week.

11. Wendy B. secure and maintain stable housing and a means of support for her children.

12. That a Review Hearing be scheduled in 60 days.

### *"PERMANENCY PLAN*

The Permanency Plan for Max and Nicole B. is Reunification with a parent. The Department will continue to work towards the plan of Reunification for the next 60 days."

At the September 15, 2005, hearing, all parties were represented by counsel except Wendy, who was not present in person and was not represented by an attorney whose appearance was entered. An attorney was present who stated that

he had been "contacted by someone on behalf of the mother, and asked to be here with her," and that he believed that "she was dropped off at the court." This attorney declined to enter an appearance for Wendy until he could "meet with her and recommend to her what should be done." John's attorney told the court that Wendy contacted John at 3:30 a.m. on September 15th and said that she would be at the court hearing. Nevertheless, Wendy was not present at any time during the hearing.

At the September 15th hearing, the attorney for the children raised an issue regarding visitation. The attorney stated "that the visits with the dad are sporadic, and visits with [the] mom barely happen, . . . and the kids tend to become very upset when they're expecting the visit from their parents and it doesn't happen." The children's attorney recommended that the Department attempt to arrange visitation so as to avoid this situation.

John's attorney represented to the court at the September 2005 hearing that John had "now obtained housing," that John stopped going to the Another Way Treatment Center because "he got off the methadone," that John attended "Addiction Services Coordination" (ASC), and that John was "willing to go to an inpatient program if that's what's recommended."

There were no objections to Department's recommendations, and the Circuit Court on September 15th adopted the recommendations.

John reported that directly after the September 15th hearing, he went to ASC and attempted to enroll in an inpatient treatment program, but no beds were available at that time. Subsequently, John reported to the Department that he had stopped calling the inpatient treatment facility because he did not want to lose his housing. He also reported that on October 12, 2005, he got a job. During this period following the September hearing, John visited his children on a regular basis.

The Review Report prepared for the December hearing noted that Wendy secured employment but that she still did

not have stable housing. The social worker reported that, on one occasion, Wendy was late for an appointment to visit the children and appeared to be under the influence of drugs or alcohol, slurring her words and moving in slow motion. She upset the children by telling them that she would be leaving for 28 days to attend a rehabilitation program. She did not, however, attend the program. Late in October, she went to ASC, tested positive for cocaine and benzodiazepines, and was referred for an extended evaluation.

On November 21, 2005, the Department changed the permanency plan from reunification with a parent to placement with a relative. The Department based this decision on the "parents' lack of progress towards Reunification," and on both parents' failure to comply with the Department's recommendations. The Department also considered the parents' substance abuse, their failure to participate in twice-weekly urinalysis and breathalyzer tests, and their failure to provide documentation of a permanent residence.

At the December 19, 2005, hearing, a representative of the Yankton Sioux Tribe of South Dakota was present. The representative stated that he was the Indian Child Welfare Act's "specialist for the Yankton Sioux Tribe" and that, although the Tribe had been looking for relatives to care for the children, the Tribe had not "found any relatives as of yet." The Tribe presented a petition to intervene, but the petition had not been properly filed with the court and copies had not been sent to the other parties. The Circuit Court noted in its order that a motion to intervene by the Yankton Sioux Tribe would subsequently be filed.

Wendy and her attorney attended the December 19th hearing, the first hearing in this case which she attended. Wendy's attorney objected to the Department's change of permanency plan from reunification to placement with a relative, but the trial judge pointed out that Wendy had not completed any kind of in-house drug treatment program and that she had missed several urinalyses. The judge also said that, in order to achieve reunification, the parents needed to demonstrate

that they are drug-free. The trial judge explained to the parents:

"That means that you are probably going to have to go through an in-house program, based on your history. And, you are going to have to have a long period of time where your urines are clean. And that you haven't missed any. And, that you've got a place to take the children where they'll be safe, and where they'll be comfortable."

The judge further stated to the parents:

"[I]t's clear to me that the County has made an awful lot of effort, here, to try and get these kids back to you. And, you guys are not doing your, you are not doing your share. You are not keeping up your part of the bargain."

The case was then continued, and the order issued by the court reiterated "that the conditions and requirements of this court's previous Order of September 15, 2005, shall remain in effect."

On January 25, 2006, Wendy was admitted to an inpatient drug treatment program, but she refused to meet with the Department's social worker while participating in the program or verify her completion of the program. Following the inpatient program, Wendy was referred to a continuing program for substance abuse treatment, but she did not attend because, in her view, the $12 per day fee was too expensive. During the period from January 2006 until the Department's next Review Report dated April 13, 2006, Wendy participated in only two urine tests, even though the Circuit Court had ordered her to participate in twice weekly urine screens, and she was informed that missed tests would be considered positives.

In February 2006, Wendy reported that she had rented an apartment with Tommy, who was her "boyfriend" and, as previously noted, John's brother. By April 2006, however, Wendy experienced problems with that housing situation, reporting to the Department that there were vicious dogs there that had bitten her, John, and Tommy, and that she had

stayed in a hotel for a few nights to avoid the dogs and to be closer to her employer.

John also attended an inpatient drug treatment program some time in March 2006. John provided no documentation to the Department regarding the completion of his inpatient treatment program, and he failed to participate in the twice weekly urinalyses. The Department later learned that John did not complete the inpatient treatment program because he was expelled from the program for violating the program's rules.

The April 13th Review Report again summarized the efforts of the Department and the circumstances regarding the parents and the children. The report stated that the children continued to thrive in their current placement and that they had "obviously bonded to their 'Aunt Denise' and [her fiancee] 'Uncle Gary.'" Max received the dental care he needed and attended weekly therapy sessions with a psychiatrist. Nicole was potty trained; her immunizations were updated, and she also attended therapy sessions.

Sometime in March or April 2006, John lost his housing and was staying with Wendy and Tommy. Despite the court orders of September 15, 2005, and December 19, 2005, requiring John's "[p]articipat[ion] in mental health treatment, including medication management," the Department reported that John was not getting treatment for his mental health issues. Wendy similarly had failed to secure stable housing, had failed to verify her completion of a substance abuse program, and had not participated in the twice-weekly urinalyses. The Review Report also noted that Wendy had missed more than ten visits with Max and Nicole, while John had missed five visits. The Review Report set forth the Department's position that "John and Wendy B. have made no significant progress towards reunification," pointing out that, while both attended inpatient treatment, they both failed to provide documentation of permanent residence or verify that they had maintained their sobriety.

At the start of the April 27, 2006, hearing, an attorney representing the Yankton Sioux Tribe of South Dakota filed the Tribe's motion to intervene. The Tribe also filed a motion to transfer the case to tribal jurisdiction, but the Department opposed that motion, pointing out that the Tribe had been on notice of the children's status since August 2005. As earlier mentioned, the trial judge granted the Tribe's motion to intervene but denied the Tribe's motion to transfer jurisdiction. The trial judge stated that the motion to transfer jurisdiction had been filed "at the eleventh hour," that the "children have been under the jurisdiction of the Department for nearly a year," and that the Department had provided "an incredible amount of information concerning the services that have been provided to these children." The judge also found that transferring jurisdiction "would be contrary to the welfare of these children, given the fact that the services have been in place for such a period of time." The Tribe's attorney participated in the morning portion of the April 27th hearing but left before the afternoon session. Consequently, the Tribe's attorney was not present when Wendy and Denise testified during the afternoon.

At the April 27th hearing, the Department asked the trial judge to leave the children in the relative placement with their aunt, Denise, and to close the case. The attorney for John and the attorney representing Wendy each asked the judge to postpone closing the case because, as they argued, "we are not at the point where this case should be closed." The Tribe joined in the parents' request to leave the case open.

Several witnesses testified at the April 27, 2006, hearing with regard to the activities of the Department, the children's progress, and the parents' efforts towards reunification. A clinical social worker from the "Reginald Lourie Center for Infants and Young Children" testified concerning the therapy which she had provided to Nicole. The clinical social worker had determined that Nicole suffered from post-traumatic stress disorder. The social worker testified that, when she first began to work with Nicole, the child was "highly restricted in her movements, very pale, . . . looking very afraid and

guarded." During the time Nicole lived with Denise, however, the social worker had observed "an incredible improvement with a brighter aspect, less depression." When questioned regarding the impact of removing Nicole from Denise's home, the clinical social worker stated:

"[A]t this time, Nicole's made incredible progress in gaining a trust of adults that she knows that will keep her safe. And, she has just begun to be more free in movements, freer in her play, less anxious at home and less anxious at school. Any sort of huge adjustment, change, in her environment is going to further exacerbate her symptoms and bring her back to where she was when she first came in. And it might, her symptoms might even become worse than they were initially."

A representative of the Avery Road Treatment Center, the inpatient drug treatment program attended by both John and Wendy, testified that John had been discharged from the program for violating program rules. The representative further testified that Wendy successfully completed the Avery Road program and that she was referred to a methadone treatment facility. On discharge, the program recommended that Wendy abstain from alcohol and stay away from others drinking alcohol. The supervisor of the urine monitoring program also testified, stating that the most recent urinalysis of John, conducted on April 14th, tested positive for benzodiazepine, cocaine and opiate. The supervisor also testified that both John and Wendy had multiple "no shows" between January and April.

Denise, the aunt and caretaker of the children, testified that, when Nicole was first placed with her, the child had not had any vaccinations since infancy, that she was not potty trained, and that she was very shy and withdrawn. According to Denise, Nicole also suffered from terror nightmares when she was first placed with Denise. Max was also very shy at first, Denise testified, and "he needed special help in kindergarten" and was behind in reading. Denise also said that she had smelled alcohol on Wendy during some of her visits with the children, but that she never confronted Wendy about it.

Denise stated that the last time she spoke to John and Wendy, "they were living at a hotel" and that she had "really no way to reach them, unless I talk to [the social worker]." She also testified that she had received $1,200 from John shortly after the children were placed in her custody, but that the parents had not provided her with any monetary support since then. Vincent B., another brother of John B. and Denise P., also testified regarding the care of the children. He stated that he had seen "an amazing change" in the children since they moved in with Denise.

The Department's social worker, Karen Crist, who had worked directly with John and Wendy, testified at the April 27th hearing that she had attempted to help John find affordable mental health treatment by giving him an application for a pharmacy assistance program and encouraging him to get involved in the substance abuse treatment program that was a prerequisite to most mental health programs. She stated that John had not been forthcoming regarding his participation in the substance abuse treatment program, making it difficult for her to work with him because he never signed the consent forms necessary for her to work with his program facilitators.

John chose not to testify during the April hearing. Wendy did testify that she had attended the Avery Road substance abuse program, which she followed up with a methadone program, "AA meetings, a Bible retreat, and ... [she also] enrolled in the abused persons program." When the children were living with her, she stated that Max was "doing really good as a kindergartner" and she had taken the children to Title IX Indian Education Programs twice a week. According to Wendy, the death of the children's grandmother had led to the children's post-traumatic stress disorder. Wendy presented the court with certificates of completion for Microsoft courses which she had taken. She also testified that she intended to return to a job with the federal government, that she had recently purchased a car, and that ultimately she wanted the court's permanency plan to be reunification between herself and the children. Her testimony, however, was vague about her living situation, her job prospects, and her

substance abuse recovery program. The trial judge later noted that he had "some issues concerning credibility" with Wendy because she failed to provide verification of her activities.

Wendy acknowledged that she and John were still married but that she currently lived with her brother-in-law, Tommy, in the basement of a house, while her husband, John, lived upstairs. Wendy testified that she had not seen the children from May through the end of August, 2005, because she was "hiding." She also admitted to "hav[ing] some beers now and then" and stated that she was currently on methadone for treatment of her oxycontin addiction.

At the end of the April 27, 2006, hearing, the Department urged the court to close the case and allow the children to stay in the care of Denise. The Department argued that "the parents have had a long time to try to make some changes, and it's just not happening." The Department also pointed out that, although both parents attended the Avery Road treatment program, John had "recently tested positive for a number of different substances" and Wendy "by her own admission, ha[d] not followed through with the recommendations from Avery Road."

The children's attorney endorsed the recommendation of the Department that the custody and guardianship of the children should stay with Denise. The children's attorney, however, agreed with John's and Wendy's position that "maybe another three months" would be appropriate to see if the parents made any other progress. Although the children's attorney noted his concerns with "all the no-shows for the urines, [and] all of the missed visitations," he encouraged the court to establish a definite visitation schedule.

John's attorney argued that the case should not be closed and that the permanency plan should be to reunify John with his children. The attorney pointed out that several of the witnesses recognized that John had a strong bond with his children and that he was a "good father." John's attorney complained that the Department had failed to provide John

with the mental health treatment needed. The attorney also highlighted John's concerns for the children's welfare.

Wendy's attorney argued that the permanency plan should remain reunification with the parents and that the court should keep the case open for three more months. The attorney claimed that Wendy had made some progress by successfully completing a substance abuse treatment program and attending AA meetings. The attorney represented that Wendy had attempted to keep in contact with the children by telephoning them and that Wendy wanted additional time to demonstrate to the court that she could do what was necessary to get her children back.

The trial judge was "underwhelmed ... at what both of you [parents] have done or, more importantly, failed to do" during the course of the Department's involvement with the children. The judge recognized that both John and Wendy had made some progress in addressing their addictions by attending the substance abuse programs, even though their progress was not "phenomenal." The judge decided to keep the case open, although the judge did agree to modify the permanency plan to placement with a relative and, to that effect, ordered that "Max and Nicole remain placed in the custody and guardianship of Denise P." The court also ordered John and Wendy to comply with a variety of recommendations from the Department, including participating in twice weekly urinalyses and finding stable housing and employment. The judge stated that, at the next hearing, he would evaluate the parties' progress, with particular attention toward "any deviation from this Court's order."

Sometime after July 12, 2006, the Yankton Sioux Tribe of South Dakota submitted a written "Objection of Intervenor Yankton Sioux Tribe to the Review Report Submitted to the Court by the Department of Human Services Dated July 12, 2006." In its objection, the Tribe alleged that "the Department has not made active efforts within the meaning of the [federal statute] to prevent the breakup of the Indian family." Specifically, the Tribe pointed out that the Department's

placement of the children with the aunt did not reflect "the unique cultur[al] heritage of the Minor Indian Children." The Tribe urged the Circuit Court to keep the case open and to "direct the Department to make active and reasonable efforts to prevent the breakup of the Indian family."

The final hearing in the case was held on July 21, 2006, and both John and Wendy attended. The evidence at the hearing was as follows. Since the April 27th hearing, John had not attended any urinalyses and Wendy had missed nine tests between May 18th and July 10th. On the dates when Wendy was screened, she tested positive for benzodiazepine on nine occasions, and, on three of those tests, she also tested positive for opiates. Wendy generally refused to take breathalyzer tests because of an asthma condition, but, on the one occasion when she was administered an oral litmus-like test, she tested positive for alcohol, though she disputed those results. Despite the Circuit Court's order requiring verification of attendance at AA meetings, John presented no verification slips and Wendy presented only one to the Department.

Neither parent at the July 21, 2006, hearing provided evidence of a stable housing situation or stable employment, and neither had consistently attended the parenting education classes arranged by the Department. Before the Department would arrange psychological and psychiatric evaluations, it had asked each parent to submit three weeks of clean drug tests, a total of "six consecutive negative urines and breathalyzers," but neither John nor Wendy submitted those clean tests.

At the July hearing, both the children's attorney and the Department argued that the court should close the case. The children's attorney said that the parents, at the April hearing, had been given "another chance, and . . . clearly, the parents haven't done anything close to what they needed to do. And I can't imagine that they're going to do it any time in the foreseeable future." He submitted that "it is absolutely not in [the children's] best interests to be reunified with [the parents] in the foreseeable future, and I think that keeping the

case open and giving the parents another chance would only make things more unstable for the children."

John, by his attorney, admitted that he was unable to care for the children and stated that "[h]e's not seeking custody of the kids, but he does support Wendy having custody of the children." John also "acknowledge[d] that he is not ready and that he couldn't do it, but he supports Wendy having the children and if not Wendy, ... he does support Denise."

Wendy's attorney again requested that the case be kept open for "at least 60 more days" to give Wendy "the opportunity to really demonstrate even further that she really would like to have her children back." Wendy showed the court a lease signed on May 26, 2006, for a home in Silver Spring, Maryland, and she provided documentation of her $15–an–hour employment. She also presented several slips verifying her attendance at AA meetings and, attempting to justify some of the positives on the urinalyses, produced pain medication prescriptions from a dentist.

The Tribe joined Wendy's argument that the case should be kept open longer, claiming that the Tribe had not been given the time necessary to evaluate whether the Department had made the "active efforts" necessary under the federal statute. The Tribe also wanted the case open so that it could assist the Department with a relative search in South Dakota. The Tribe argued that the numerous referrals provided to John and Wendy by the Department constituted "a passive activity" and did not amount to "active efforts."

In response to the Tribe's arguments, the Department indicated that its first contact with the Tribe was on August 15, 2005, and that the Tribe had not responded until April 2006. The Department also stated that there were "repeated efforts by the Department to engage the Tribe to file the right papers," but that the Tribe continually filed "procedurally defective" papers. When the court inquired what efforts the Tribe had made to find an Indian relative placement for the children, the Tribe's attorney admitted that she was "not as well informed as I should be and ... I have not exercised

discovery properly." The court commented on the Tribe's objections, noting that,

> "as far as the County not being able to provide the service themselves, but directing it, that's for the legislature because ... it's not like they have the psychiatrist on call in their building and they're purposely telling mom to go somewhere else. This is the way that they operate. They provide the services, they let them know where the programs are and then the parents either show up or they don't, or they get something out of it or they don't."

The Tribe conceded that the Department "has made efforts in the best interests of the children," but concluded that those efforts were not "active efforts at this point in time as required by federal law."

John himself made a statement to the court, saying that the children should be placed with Wendy because "[t]here's no reason why they should not live with this woman." The Department's social worker, however, countered John's statements by pointing out that only ten days earlier, John had contacted the social worker, saying that Wendy's "home was not safe, that he did not want the children going with Mrs. B., [and] that there were 30 beer cans in the trash can." The social worker also stated that John, during the same conversation, "indicated that he wanted the kids to remain with Denise." While John, at the hearing, admitted that he had made those statements, he claimed that "his concerns were about Tommy, not about Wendy," and that, as Tommy was now allegedly not living with Wendy, John was no longer concerned for the children's welfare.

In rendering his decision to close the case, the trial judge pointed out that John was no longer seeking custody of the children, but the Judge declined to accept John's recommendation that the children stay with Wendy. The court stated:

> "I won't address John because he's obviously graciously, and quite properly, backed himself out of the consideration, but also consider[ing] his strong substance abuse problems himself, and I consider that when I consider his recommen-

dations as well, that is, that he recommend that the children go live with their mother."

With regard to Wendy, the judge summarized her recent actions as follows:

"Wendy B.'s minimization and denial of her alcohol and prescription abuse is alarming, and seriously jeopardizes her ability to provide a safe and stable home environment for the children, and she's not consistently participated in weekly urinalysis."

The judge continued:

"John, Wendy and Tommy remain in a crisis-driven, triangulated relationship. And I don't think for one moment, that, based on the history of this case, that mom is not going to get herself back in another jam, whether it's with Tommy or somebody else. There's no reason to believe that she'll make good choices. She hasn't yet, and is probably unable to because of the substance abuse.

"Now Max and Nicole are in a safe and stable living environment, which we all want, with their paternal aunt who is willing and able to provide for the children, and the doctor's reports indicate that ... the kids will be in good hands with [Denise]."

The trial judge found that Wendy had "proven to this court that she's chosen drugs over her children.... [T]he record is clear. This is not a hard case to make the decision on." The judge concluded:

"It's an easy decision because we've had over 14 months and you basically haven't gotten any farther, in the court's opinion, along the way towards addressing your substance and alcohol abuse problem, addressing your relationship problem, addressing what the kids need to be exposed to and what they don't need to be exposed to, what you can say to children, what you can't say to children, and what's in the best interests of the children."

After the judge stated that he had decided to leave the children in the custody of Denise and to close the CINA case, the attorney for John, the attorney for Wendy, and the Tribe's

attorney objected on the ground that the decision was not in accordance with the federal statute. The court's order closing the case was entered on August 1, 2006.

## II.

Neither the Tribe, nor the attorney for Wendy, nor the attorney for John, filed a notice of appeal. Moreover, Wendy did not file a pro se notice of appeal. On August 28, 2006, John, pro se, filed a "line" containing the handwritten word "Appeal," John's signature, and an address block with the names "John, Wendy B.," printed in it, along with their address. Subsequently, the Maryland Public Defender's Office apparently undertook to represent both John and Wendy before the Court of Special Appeals.

The Department filed a motion in the Court of Special Appeals to dismiss the purported appeal of Wendy on the ground that she filed no notice of appeal and thus was not a party to the appellate proceedings. The Court of Special Appeals denied the motion to dismiss Wendy's "appeal." While acknowledging that the notice of appeal was signed only by John, the Court of Special Appeals held that the pro se notice of appeal by John "indicate[d] the intent of both parties to appeal the circuit court's decision." *In re Nicole B. and Max B.*, 175 Md.App. 450, 458, 927 A.2d 1194, 1198 (2007).

On the merits, the Court of Special Appeals vacated the decision closing the CINA case and remanded the case to the Circuit Court. *In re Nicole B. and Max B., supra,* 175 Md.App. at 474–475, 927 A.2d at 1208. The intermediate appellate court seemed to find fault with the Circuit Court's decision because the Circuit Court "did not specifically make factual findings regarding the" federal Indian Child Welfare Act of 1978. *In re Nicole B. and Max B.*, 175 Md.App. at 461, 927 A.2d at 1200. Nevertheless, the Court of Special Appeals acknowledged that the Circuit Court "did address the efforts that the Department made to reunify Mr. and Mrs. B. with their children" (ibid.). The Court of Special Appeals "empha-size[d] ... that the requirement of 'active efforts' does not

require 'futile efforts'" (175 Md.App. at 472, 927 A.2d at 1206), and stated that "[w]e do not know exactly what additional services the Department could have provided." 175 Md.App. at 473, 927 A.2d at 1207. The Court of Special Appeals concluded (175 Md.App. at 474–475, 927 A.2d at 1208):

"[W]e vacate the closure of the B.'s CINA case, and remand for further proceedings consistent with this opinion. On remand, the circuit court, in determining if it should retain jurisdiction, should evaluate whether, in light of all the circumstances and resources reasonably available to the Department, the latter made sufficient active efforts to facilitate and provide treatment for the B.'s, in light of the mental health disorders."

The Department filed a petition for a writ of certiorari which this Court granted. *In re Nicole B. and Max B.*, 402 Md. 36, 935 A.2d 406 (2007). Neither John nor Wendy filed a cross-petition for certiorari.[8]

### III.

▮▮▮▮ The Department in this Court repeats its contention that Wendy's "appeal" should have been dismissed by the Court of Special Appeals. The Department relies on the failure of Wendy, either pro se or by an attorney, to file a notice of appeal. The Department, however, takes the position that John was entitled to appeal because he "meets the statutory definition of a 'parent' of an 'Indian Child' with standing to appeal. *See* 25 U.S.C.A. § 1903(4), (9) . . . . " (Department's brief in this Court at 22 n. 6).

Even if the Department had not raised the issues regarding the respondents' right to appeal, this Court, as a matter of Maryland appellate procedure, would address the issues *sua sponte*.

---

8. The Yankton Sioux Tribe of South Dakota is not a party to the appellate proceedings in this case because the Tribe, although a party in the Circuit Court, had not taken an appeal from the Circuit Court's judgment. Nevertheless, the Tribe was given permission to file, and did file, an amicus curiae brief in this Court.

■ With regard to Wendy's "appeal," a party in the trial court must file a timely notice of appeal, from an appealable judgment, in order to confer upon an appellate court subject matter jurisdiction over that party's appeal. *See, e.g., Houghton v. County Commissioners of Kent County,* 305 Md. 407, 413, 504 A.2d 1145, 1148, *motion for reconsideration denied,* 307 Md. 216, 513 A.2d 291 (1986) ("The requirement ... that an order of appeal be filed within thirty days of a final judgment is jurisdictional; if the requirement is not met, the appellate court acquires no jurisdiction and the appeal must be dismissed"); *Joseph H. Munson Co. v. Secretary of State,* 294 Md. 160, 168, 448 A.2d 935, 939–940 (1982), *affirmed,* 467 U.S. 947, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984); Maryland Rule 8–201(a). In addition, *see, e.g., East v. Gilchrist,* 293 Md. 453, 458, 445 A.2d 343, 345 (1982) (" '[T]his Court will dismiss an appeal *sua sponte* when it notices that appellate jurisdiction is lacking' "); *Biro v. Schombert,* 285 Md. 290, 293, 402 A.2d 71, 73 (1979) ("[W]here the Court of Special Appeals has entertained an appeal without having jurisdiction to do so, and the case is timely brought to our attention (such as by a petition for a writ of certiorari dealing with the merits of the appeal), we will issue a writ of certiorari and *sua sponte* consider the jurisdiction of the intermediate appellate court"); *Eastgate Associates v. Apper,* 276 Md. 698, 701, 350 A.2d 661, 663 (1976) ("Where appellate jurisdiction is lacking, the appellate court will dismiss the appeal *sua sponte"*). The United States Supreme Court has taken the same position. *See, e.g., Liberty Mut. Ins. Co. v. Wetzel,* 424 U.S. 737, 740, 96 S.Ct. 1202, 1204, 47 L.Ed.2d 435, 439 (1976) ("Though neither party has questioned the jurisdiction of the Court of Appeals to entertain the appeal, we are obligated to do so on our own motion if a question thereto exists").

It is clear that the Court of Special Appeals erred by denying the Department's motion to dismiss Wendy's appeal. Wendy's attorney did not file a notice of appeal on behalf of Wendy. Wendy herself did not, pro se, file a notice of appeal, and Wendy did not sign the notice of appeal filed by John. The fact that John printed his and Wendy's name and address in

the address block of the notice of appeal is no indication that John was attempting to appeal on behalf of Wendy.

■ Moreover, even if the notice of appeal were construed as an effort by John to appeal on behalf of Wendy, it would still be insufficient to confer appellate jurisdiction over Wendy's appeal. One spouse's signature on a pleading, legal document, contract, etc., which is intended by the signer to be on behalf of both spouses, is not by itself sufficient to make the signing spouse an agent of the non-signing spouse or to include the non-signing spouse. *See, e.g., Routzahn v. Cromer,* 220 Md. 65, 70, 150 A.2d 912, 915 (1959) (A contract signed by the husband, and intended to include his wife, did not include his wife as "the relationship of principal and agent between a husband and wife may not be implied solely from the marital status of the parties"); *William Penn Supply Corp. v. Watterson,* 218 Md. 291, 296, 146 A.2d 420, 422 (1958) (A materialman could not enforce a mechanics' lien because the notice to the husband was not received by the wife, and the Court has "consistently held that the relationship of principal and agent between a husband and wife may not be implied from the marital status of the parties"); *White v. Friel,* 210 Md. 274, 284, 123 A.2d 303, 308 (1956) ("The husband is not the agent of the wife merely because of the husband-wife relationship"); *Bukowitz v. Maryland Lumber Company,* 210 Md. 148, 153, 122 A.2d 486, 488 (1956) (same); *Twilley v. Bromley,* 192 Md. 465, 470–471, 64 A.2d 553, 556 (1949) ("Neither the existence of the relationship of husband and wife, standing alone, nor knowledge by her of his intention . . ., together with failure on her part to object, is sufficient to constitute him her agent"); *Ridgeley v. Crandall,* 4 Md. 435 (1853) (A pleading filed by the husband, and intended to include his wife, did not include the wife, and she was not properly a party to the action). In light of these decisions, as well as many more opinions of this Court, John's signature on a notice of appeal did not make Wendy a party to the appellate proceedings.

 As to John's appeal, the issue is whether he is attempting to appeal from a judgment to which he consented or acquiesced. It is well-settled that a party in the trial court is not entitled to appeal from a judgment or order if that party consented to or acquiesced in that judgment or order. Furthermore, this is an issue which an appellate court will address even if the right to appeal is not contested by another party. *Globe American Casualty Company v. Chung,* 322 Md. 713, 589 A.2d 956 (1991). As Judge Bell pointed out for the Court in *Osztreicher v. Juanteguy,* 338 Md. 528, 534, 659 A.2d 1278, 1281 (1995), "[i]t is well settled in Maryland that the right to appeal may be lost by acquiescence in, or recognition of, the validity of the decision below from which the appeal is taken or by otherwise taking a position which is inconsistent with the right of appeal" (internal quotation marks omitted). *See also, e.g., Parker v. State,* 402 Md. 372, 405, 936 A.2d 862, 882 (2007); *Suter v. Stuckey,* 402 Md. 211, 222–225, 935 A.2d 731, 738–740 (2007); *Franzen v. Dubinok,* 290 Md. 65, 68–69, 427 A.2d 1002, 1004–1005 (1981); *Lohss and Sprenkle v. State,* 272 Md. 113, 118–119, 321 A.2d 534, 537–538 (1974).

 The status of John in these appellate proceedings presents a closer issue than the status of Wendy. Although the federal statute may generally give John standing as a parent of a Native-American child, the federal act does not purport to abrogate settled procedural rules such as the principle that a party in the trial court may not appeal from a judgment in which that party acquiesced.

If the portion of the Circuit Court's judgment regarding the custody of the children were the focal point of John's appeal, it is likely that his appeal would have to be dismissed under the principle that one may not appeal from a judgment in which he or she acquiesced. At the final Circuit Court hearing in July 2006, John acknowledged that he was unable to care for the children and that he was not seeking custody. He recommended that the children be placed in the custody of Wendy or, if not Wendy, in the custody of Denise. Several days earlier, John had told the Department that Wendy's home was

unsafe and that he wanted the children to remain in Denise's custody.

Nevertheless, John did oppose the closure of the CINA case, and the Court of Special Appeals' decision was to vacate the closure of the case. Thus, John's objection to the Circuit Court's order closing the CINA case was sustained by the Court of Special Appeals. Consequently, John was aggrieved by the Circuit Court's judgment. He did have standing to appeal that judgment, and he is an appropriate respondent in this Court.

## IV.

As mentioned earlier, the Court of Special Appeals' decision appeared to be based, in part, upon the Circuit Court's failure, in its findings of fact, to use the specific language of the federal Indian Child Welfare Act of 1978. In addition, John B. in this Court relies heavily on the "active efforts" language of the federal statute.

■ While the Department and the Circuit Court may not have used the language of the federal statute, what is important is whether the Department in substance made active efforts to prevent the breakup of the family, whether those efforts were unsuccessful, and whether the Circuit Court's findings reflected that active efforts were in fact made and were unsuccessful.

■ As numerous opinions of this Court teach, we should examine the substance of the Department's and Circuit Court's actions; we should not decide the case based upon the use, or failure to use, the statutory label "active efforts." The governing principle is that, in applying statutes, other enactments, pleadings, or legal principles, "courts must ordinarily look beyond labels ... and make determinations based on ... substance," *Piven v. Comcast Corporation*, 397 Md. 278, 290, 916 A.2d 984, 991 (2007). *See, e.g., In re Deontay J.*, 408 Md. 152, 160, 968 A.2d 1067, 1071 (2009) (relying upon "the well established principle 'that the substance rather than the form

... is the controlling consideration'"); *Alitalia v. Tornillo*, 320 Md. 192, 195, 577 A.2d 34, 36 (1990) ("Ordinarily, 'magic words' are not essential.... Courts and administrative agencies are expected to look at the substance"); *Matter of Spalding*, 273 Md. 690, 703, 332 A.2d 246, 253 (1975) ("[I]t is clear that labels are not controlling in determining the applicability of" a constitutional provision); *Korzendorfer Realty v. Bufalo*, 264 Md. 293, 296, 286 A.2d 142, 144 (1972) ("It has long been held that substance takes precedence over form"). *See also, e.g., Murrell v. Baltimore*, 376 Md. 170, 193–196, 829 A.2d 548, 563 (2003); *Kant v. Montgomery County*, 365 Md. 269, 274, 778 A.2d 384, 386–387 (2001); *Gisriel v. Ocean City Elections Board*, 345 Md. 477, 500, 693 A.2d 757, 768 (1997), *cert. denied*, 522 U.S. 1053, 118 S.Ct. 702, 139 L.Ed.2d 645 (1998); *Gluckstern v. Sutton*, 319 Md. 634, 650–651, 574 A.2d 898, 906 *cert. denied sub. nom., Henneberry v. Sutton*, 498 U.S. 950, 111 S.Ct. 369, 112 L.Ed.2d 331 (1990); *Lapp v. Stanton*, 116 Md. 197, 199, 81 A. 675, 676 (1911).

Turning specifically to cases applying the federal Indian Child Welfare Act of 1978, appellate courts generally examine the actual evidence in the case instead of requiring trial courts to use the phraseology of the federal statute. For example, in *In Interest of J.S.B., Jr.*, 691 N.W.2d 611 (S.D.2005), the trial court had held that the federal statute and the "active efforts" standard were not applicable to the case. The Supreme Court of South Dakota disagreed with this conclusion and held that the federal statute was applicable. Nonetheless, the South Dakota Supreme Court affirmed on the ground that, "despite the [trial] court's erroneous ruling, the record reflects that the Department of Social Services ... [did in fact] provide 'active efforts' to reunify the family, but such efforts were unsuccessful." 691 N.W.2d at 613. *See also, e.g., A.A. v. State of Alaska, Department of Family & Youth Services*, 982 P.2d 256, 261 (Alaska 1999) ("In accordance with other jurisdictions' case-by-case approach, we have held that 'no pat formula' exists for distinguishing between active and passive efforts") (footnotes omitted); *In the Matter of M.D.M.*, 313 Mont. 51, 56, 59 P.3d 1142, 1146 (2002) (In a case under the federal

statute, a reversal because of the trial court's failure to set forth a pertinent legal conclusion "would be to elevate form over substance"); *In the Matter of H.J.,* 149 P.3d 1073, 1077 n. 3, 1078 (Okla.Civ.App.2006) (After pointing out that there is no precise definition of what constitutes "active efforts" under the federal statute, and that it should be " 'determined by the appellate court on a case by case basis,' " the court held that the actual evidence before the trial court was determinative).

The Nebraska Court of Appeals, "noting the principle that the law respects form less than substance," went on to point out, regarding cases under the federal Indian Child Welfare Act of 1978, "that each case is dependent upon its particular facts and circumstances." *In re Interest of Enrique P.,* 14 Neb.App. 453, 469, 709 N.W.2d 676, 689 (2006) (Internal quotation marks omitted). The Nebraska Court, in language that would largely be applicable to the present case, concluded (14 Neb.App. at 471, 709 N.W.2d at 689–690):

"[T]he juvenile court did not articulate a standard by which it made its findings; nor did it make a finding, supported by testimony of qualified expert witnesses, that active but unsuccessful efforts had been made to prevent the breakup of the Indian family or that continued custody of the children by [their mother] Shannon was likely to result in serious emotional or physical damage. * * * [W]e find that any error related to the juvenile court's failure to specifically state the foregoing was harmless error in that the evidence would have supported these ICWA [Indian Child Welfare Act] findings.

"In sum, we first find that there was clear and convincing evidence to support a finding that active efforts had been made to prevent the breakup of this family—which efforts included therapy, placement, case management, psychiatric and chemical dependency evaluations, visitation services, transportation assistance with visitation, parenting and domestic violence classes, and random urine analysis—and that such efforts were unsuccessful. Second, * * * the evidence adduced by the State at the dispositional hearing clearly and convincingly supports ... a finding of harm [if

the children were returned to the custody of their mother, Shannon]. Shannon's psychological evaluation indicated that Shannon had a history of drug and alcohol abuse, and her diagnoses included major depressive disorder, alcohol dependence, adjustment disorder with anxiety, and antisocial and depressive personality features. The conclusions of the evaluation indicated that Shannon's parenting problems stemmed from her addiction, rather than a psychopathology, and that while Shannon completed her inpatient chemical dependency treatment, she failed to complete outpatient treatment and did not provide verification that she was attending Alcoholics Anonymous or Narcotics Anonymous meetings or that she had obtained a 'sponsor.' Shannon did not submit to all of the requested urinalysis screenings. In addition, Shannon did not address her domestic violence issues through a group setting or through individual therapy; nor did she attend parenting classes. Shannon had no proper housing or employment, and her visitation with her children was sporadic. Based upon the psychological evaluation and the caseworkers' court reports, it has been clearly and convincingly shown that custody with Shannon would result in serious emotional or physical damage to the children."

For the most part, the above-quoted summary could be used to describe the circumstances regarding Wendy B. and John B.

 The facts in the case at bar, reviewed in detail in Part I of this opinion, demonstrate that the Department did make "active efforts" to reunify the family, that those efforts were unsuccessful, that the trial court's findings reflected the unsuccessful active efforts made by the Department, and that the trial court was fully justified in closing the CINA case. As previously set forth, the Court of Special Appeals acknowledged that "[w]e do not know exactly what additional services the Department could have provided." *In re Nicole B. and Max B., supra,* 175 Md.App. at 473, 927 A.2d at 1207. The brief in this Court on behalf of John B., in the argument portion, makes only two comments which seem to be specific

to the facts of this case and relate to the Department's alleged failure to make active efforts. First, it is asserted that

"facilitating visitation and 'working with' therapists and teachers ... show[s] that it [the Department] may have taken reasonable steps, but it has not taken active ones." (Brief of the Respondent John B. at 15).

Second, John B.'s brief states that

"parents beset by drug addiction, mental illness, and the like, may turn out to be salvageable, despite predictable setbacks, if the involved social services agency expends sufficient efforts." (*Id.* at 16).

Neither the Court of Special Appeals nor any parties in this case have shown what additional efforts, which the Department is legally and fiscally authorized to do, could have been done to reunify the family without harm to the children.

The record in this case establishes that the Department offered numerous services to both John B. and Wendy B. While there were certain pre-conditions to some of these services, such as the requirement that each have six clean urine screens prior to his or her enrollment in mental health counseling, or a demonstrated commitment to sobriety before offering certain assistance, such prerequisites do not make the efforts of the Department insufficient simply because the parents failed to comply. Although not a case under the federal statute, *In re Adoption/Guardianship of Rashawn H. and Tyrese H.*, 402 Md. 477, 937 A.2d 177 (2007), is pertinent. In that case, this Court explained that the services offered by the Department must be "designed to address both the root causes and the effect of the problem," but noted that "[t]here are some limits, however, to what the State is required to do." 402 Md. at 500, 937 A.2d at 191. The Court specified (402 Md. at 500–501, 937 A.2d at 191):

"The State is not obliged to find employment for the parent, to find and pay for permanent and suitable housing for the family, ... or to cure or ameliorate any disability that prevents the parent from being able to care for the child. It must provide reasonable assistance in helping the parent

to achieve those goals, but its duty to protect the health and safety of the children is not lessened and cannot be cast aside if the parent, despite that assistance, remains unable or unwilling to provide appropriate care."

Courts have accepted a wide array of actions by social services organizations as meeting the federal Indian Child Welfare Act's "active efforts" standard. In *In the Matter of A.N.*, 325 Mont. 379, 382, 106 P.3d 556, 559 (2005), the Montana Supreme Court reviewed a case where the father of two Indian children was accused of abuse and neglect, and was given treatment plans by the Department of Public Health and Human Services. The treatment plans included many of the same services offered to John B. and Wendy B., including chemical dependency evaluations, drug screens, counseling sessions, parenting classes, and meetings with the social worker. Where the father completed only three of the thirteen tasks assigned to him and showed up intoxicated outside the foster home, the court concluded that the "Department's efforts were as active as possible" in light of the father's unavailability. *In the Matter of A.N., supra,* 325 Mont. at 385, 106 P.3d at 561. In response to the father's claim that the Department failed to provide "active efforts" as required under the federal statute, the Supreme Court of Montana explained (325 Mont. at 385, 106 P.3d at 561):

"The Department's efforts were as active as possible. It was [the] Father's apparent apathy and indifference that prevented him from completing his treatment plans. Without any involvement, even to the absolute minimal level of giving [the social worker] his contact information, [the] Father prevented the Department from making active efforts at providing more intensive services."

The Supreme Court of Alaska, in *E.A. v. State Div. of Family & Youth Services*, 46 P.3d 986, 991 (Alaska 2002), held that " 'a parent's demonstrated lack of willingness to participate in treatment may be considered in determining whether the state has taken active efforts.' " The Alaska Supreme Court recognized that where the Department of Family and Youth Services' efforts consisted "largely of failed attempts to

contact [the mother] or obtain information from her rather than the provision of services, [the mother's] evasive, combative conduct rendered provision of services practically impossible." 46 P.3d at 990. *See also In re J.S.B, Jr., supra,* 691 N.W.2d at 621, where the South Dakota Supreme Court held that the "active efforts" requirement of the federal statute was satisfied when a father continued to abuse alcohol and failed to complete an outpatient treatment program.

In the present case, the Department made extensive active efforts to reunify Nicole and Max with their parents, while still attempting to locate a permanent placement with stability and safety for the children. The Department's efforts extended over 14 months, with five "Review Reports" and five Circuit Court hearings. The active efforts by the Department to help reunify the children with their parents were continually rebuffed or hindered by John B. and Wendy B. John and Wendy continued their substance abuse, failed to follow the Department's recommendations regarding that abuse, failed to secure stable housing for themselves and the children, failed to show up for various scheduled appointments or visitation with the children, could not be located on many occasions, and generally failed to avail themselves of the help offered to them from the Department.

In the language of the Indian Child Welfare Act of 1978, 25 U.S.C. § 1912(d), the record shows "that active efforts" were "made to provide remedial services and rehabilitative programs designed to prevent the breakup of the" family in this case, "and that these efforts have proved unsuccessful." [9]

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED AND CASE REMANDED TO THE COURT*

---

9. Judge Raker's dissenting opinion accuses the majority of "usurp[ing] the role of the trial court and ... mak[ing] first level findings of fact." Actually, we have not made a single "first level finding of fact." What we have done is to review extensively the evidence in the trial court record, which evidence is basically undisputed. The purpose of such review is to show that the trial judge's decision was supported by the evidence and to show that the "active efforts" standard of the federal statute was met by the evidence in the trial court's record. This is one of the normal functions of an appellate court.

*OF SPECIAL APPEALS WITH DIRECTIONS TO GRANT THE MOTION TO DISMISS WENDY B's APPEAL AND, OTHERWISE, TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENT JOHN B.*

BELL, C.J., and RAKER, J., Dissent.

RAKER, J. dissenting, joined by BELL, C.J.:

I respectfully dissent. I agree with the well-reasoned opinion of the Court of Special Appeals, Judge Sally Adkins writing for the majority, in which the court held that "the 'active efforts' standard [of the ICWA] requires more effort than a 'reasonable efforts' standard does [under § 5–525 of the Family Law Article of the Maryland Code]." *In re Nicole B.,* 175 Md.App. 450, 472, 927 A.2d 1194, 1206 (2007).

I disagree with the majority's decision to avoid answering the certiorari question [1] in this case, *i.e.,* whether "reasonable efforts" as used in the Federal statute, differ from "active efforts" as used in the Family Law Article.[2] Second, I do not believe it is appropriate for this Court to usurp the role of the trial court and to make first level findings of fact. The trial court used the wrong standard when it concluded that the Department made reasonable efforts to achieve reunification with the children's parents. Accordingly, I would hold that the ICWA requirement that *active* efforts have been made to provide remedial services and rehabilitative programs de-

---

1. The certiorari question reads as follows:
 "Are 'active efforts' to prevent the breakup of an Indian family under ICWA equivalent to 'reasonable efforts' to preserve and reunify families under federal and Maryland law, so that further, futile reunification efforts are unnecessary when foster placement is in a Native American child's proven best interest?"
 *In re Nicole B.,* 402 Md. 36, 935 A.2d 406 (2007).

2. Did this Court really take this case to make the factual determination that the Department of Social Services actually made "active efforts" to reunite this family?

signed to prevent the breakup of the Indian family have proved unsuccessful is a different standard than that set out in § 5–525 of the Family Law Article of the Maryland Code which requires that reasonable efforts have been made.

Ms. B. is a registered member of the Yankton Sioux Tribe. Max B. is also a registered member of the Tribe and Nicole B. is eligible for membership. Accordingly, pursuant to the ICWA, Max B. and Nicole B. are "Indian children" and the Tribe is entitled to notice and the right of intervention in any involuntary proceeding in a State court regarding foster care placement or termination of parental rights. 25 U.S.C. § § 1903(4), 1911(c), 1912(a) (2006). According to the Department report, the Department "made efforts" to contact the Tribe to inform the Tribe that Max B. had been committed to the Department's care. At the second permanency plan review hearing in December, a representative of the Tribe moved to intervene in the case pursuant to 25 U.S.C. § 1911(c), a provision of the ICWA, which allows for intervention by the Indian custodian or Indian tribe at any point in a State court proceeding prior to the foster care placement of, or termination of parental rights to, an Indian child. 25 U.S.C. § 1911(c). At the hearing, the tribal representative indicated that the Tribe was searching for relatives of Nicole B. and Max B. within the Tribe, but no relatives had yet been found. The Juvenile Court continued the hearing to allow the representative to file the proper pleading to intervene.[3]

At the July 21, 2006 permanency plan review hearing, the Department represented that the children should remain in the care of their aunt and that the court should rescind its jurisdiction over the placement and close the case. The attorney for both children agreed with the Department and asked the court to close the case, stating that keeping the case open would "make things more unstable for the children." The Tribe maintained that the Department had not complied with the ICWA because the Department had not made "active

---

3. The Juvenile Court granted the Tribe's motion at the April permanency plan hearing.

efforts" as required by the Act. The Tribe sought to "be allowed to continue with discovery, to see more of what's happening in the file, to work with the Department of Social Services to do a relative search for relatives at the reservation, and to discuss with the aunt ways in which she can, and should, and must, under federal law, assist these children in maintaining contact with the Tribe." The court responded that it did not fault the County for not finding a relative. The court noted that the Tribe has been on notice and that no one has "come forward saying, I am a Tribe relative of this child and I'd like to be part of the child's life." The court suggested that referrals by the County to outside parenting programs could be "active efforts" but made no explicit finding that the Department's actions in this case amounted to "active efforts" to prevent the breakup of the Indian family.

In its "Review and Order of Closure," the Juvenile Court ruled that *"reasonable efforts* have been made by the Montgomery County Department of Health and Human Services (hereinafter the "Department") to achieve Reunification with the parents . . ." and ordered the CINA case to be closed. (Emphasis added). The court ordered that the children be placed with a relative for custody and guardianship and that the children's paternal aunt, Denise P., have full care, custody and guardianship of the children. Nowhere in the Order did the court mention the ICWA or "active efforts."

The ICWA requires that before any party may effect a foster care placement of, or termination of parental rights to, an Indian child under State law, the court must be satisfied that *active* efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family. Section 5–525 of the Family Law Article of the Maryland Code requires that *reasonable* efforts shall be made to preserve and reunify families prior to placement of a child in an out-of-home placement. Based upon the plain language of the ICWA, as well as the legislative history of the federal act, I conclude, as did the Court of Special Appeals and a majority of our sister states, that "active efforts" under the ICWA are not the same as "reason-

able efforts" under § 5–525. Accordingly, because the trial judge did not consider whether the Department engaged in active efforts to prevent the breakup of the Indian family, I would remand this case to the Circuit Court for Montgomery County, sitting as the Juvenile Court, for the court to reconsider the matter under the proper standard.

As noted by the Court of Special Appeals, whether the Department has made "active efforts" under the ICWA is often a mixed question of law and fact. 175 Md.App. at 461, 927 A.2d at 1200. The Court of Special Appeals discussed the "active efforts" requirement, noting as follows:

"Definitions of 'active efforts' under the federal statute vary by state, and what constitutes 'active efforts' is usually fact specific. The majority of courts that have considered the 'active efforts' requirement, however, have determined that it sets a higher standard for social services departments than the 'reasonable efforts' required by state statutes. *See In re Welfare of Children of S. W.,* 727 N.W.2d 144, 150 (Minn.Ct.App.2007), *review denied,* Mar. 28, 2007 (Minnesota Tribal/State Indian Child Welfare Agreement defines the term 'active efforts' as 'thorough, careful, and culturally appropriate efforts'); *Winston J. v. Alaska, Dept. of Health and Soc. Servs., Ofc. of Children's Servs.,* 134 P.3d 343, 347 n. 18 (Alaska 2006) (stating that the ICWA's 'active efforts' requirement is more demanding than the 'reasonable efforts' required by the state statute); *In re Interest of Dakota L.,* 14 Neb.App. 559, 712 N.W.2d 583, 594 (2006) (recognizing that the 'active efforts' provision in the state's ICWA is 'separate and distinct' from the "reasonable efforts" in the state statute); *In re A.N.,* 325 Mont. 379, 106 P.3d 556, 560 (2005) (determining that '[t]he term active efforts, by definition, implies heightened responsibility compared to passive efforts. Giving the parent a treatment plan and waiting for him to complete it would constitute passive efforts')."

*Id.* at 471, 927 A.2d at 1206.

The term "active efforts" is found in 25 U.S.C. § 1912(d) (2006) of the ICWA, which reads, in pertinent part, as follows:

"Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."

§ 1912(d). "Reasonable efforts" is contained in § 5–525 of the Family Law Article of the Maryland Code,[4] which reads, in pertinent part, as follows:

"(d)(1) Unless a court orders that reasonable efforts are not required under § 3–812 of the Courts Article or § 5–323 of this title, **reasonable efforts shall be made to preserve and reunify families:**

(i) prior to the placement of a child in an out-of-home placement, to prevent or eliminate the need for removing the child from the child's home; and

(ii) to make it possible for a child to safely return to the child's home.

(2) In determining the reasonable efforts to be made and in making the reasonable efforts described under paragraph (1) of this subsection, the child's safety and health shall be the primary concern.

(3) Reasonable efforts to place a child for adoption or with a legal guardian may be made concurrently with the reasonable efforts described under paragraph (1) of this subsection.

(4) If continuation of reasonable efforts to reunify the child with the child's parents or guardian is determined to be inconsistent with the permanency plan for the child, reasonable efforts shall be made to place the child in a timely manner in accordance with the permanency plan and to

---

4. The subsection was amended in 2001 to reflect a change in numbering of current § 5–323 of the Family Law Article. 2001 Md. Laws, ch. 415, § 6. Recent amendments that took effect on October 1, 2008, provide for consideration of out-of-state placement in addition to in-state placement and do not otherwise effect the substance of the "reasonable efforts" standard. 2008 Md. Laws, ch. 16.

complete the steps to finalize the permanent placement of the child."

§ 5–525 (emphasis added).

The two statutes differ most strikingly in their description of the "efforts" that must be made towards reunification. The ICWA provides that a party seeking a foster care placement must satisfy the court "that active efforts have been made to provide remedial services and rehabilitative programs *designed to prevent the breakup of the Indian family.*" § 1912(d) (emphasis added). The Family Law Article provides, however, that the court must make a finding that "reasonable efforts . . . be made to preserve and reunify families." "Active" and "reasonable" are not necessarily synonymous. Black's Law Dictionary defined reasonable, in pertinent part, as follows: **"reasonable.** *adj.* **1.** Fair, proper, or moderate under the circumstances <reasonable pay>. **2.** According to reason. . . ." BLACK'S LAW DICTIONARY 1272 (7th ed. 1999). In 1997, Webster's College Dictionary defined active, in pertinent part, as follows:

"**active.** *adj.* 1. engaged in action or activity; characterized by energetic work, motion, etc. <an active life.> 2. being in existence, progress or motion: active hostilities. 3. Marked by or disposed to direct involvement in practical action . . . . 8. capable of exercising influence (opposed to passive): active treason. . . ."

RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY 13–14 (2d ed. 1997). While something that is "active" might also be "reasonable," something "reasonable" is not necessarily "active." The two terms are not equivalent in meaning.

The definitions of "active" and "reasonable," standing alone, do not fully explain the kinds of efforts the Department must make under § 1912(d)'s "active efforts" standard. The historical context of the federal "active efforts" requirement and Maryland's provision for "reasonable efforts" provides insight into the statutes' use of different terms to describe the level of services a social services agency must provide in an attempt to

achieve family reunification before an out-of-home placement is finalized.

The ICWA was passed by Congress in 1978 as the result of a growing concern that state child welfare services were harming Indian children and Indian tribes by removing Indian children from their homes and placing them with non-Indian families unnecessarily and in too great a number. In considering the history of the ICWA, the United States Supreme Court has explained as follows:

"Senate oversight hearings in 1974 yielded numerous examples, statistical data, and expert testimony documenting what one witness called '[t]he wholesale removal of Indian children from their homes, ... the most tragic aspect of Indian life today.' INDIAN CHILD WELFARE PROGRAM, HEARINGS BEFORE THE SUBCOMMITTEE ON INDIAN AFFAIRS OF THE SENATE COMMITTEE ON INTERIOR AND INSULAR AFFAIRS, 93d Cong., 2d Sess., 3 (statement of William Byler) (hereinafter 1974 Hearings). Studies undertaken by the Association on American Indian Affairs in 1969 and 1974, and presented in the Senate hearings, showed that 25 to 35% of all Indian children had been separated from their families and placed in adoptive families, foster care, or institutions. *Id.*, at 15; *see also* H.R. REP. No. 95–1386, p. 9 (1978) (hereinafter House Report), U.S. CODE CONG. & ADMIN. NEWS 1978, pp. 7530, 7531. Adoptive placements counted significantly in this total: in the State of Minnesota, for example, one in eight Indian children under the age of 18 was in an adoptive home, and during the year 1971–1972 nearly one in every four infants under one year of age was placed for adoption. The adoption rate of Indian children was eight times that of non-Indian children. Approximately 90% of the Indian placements were in non-Indian homes. 1974 Hearings, at 75–83. A number of witnesses also testified to the serious adjustment problems encountered by such children during adolescence,[ ] as well as the impact of the adoptions on Indian parents and the tribes themselves. *See generally* 1974 Hearings.

Further hearings, covering much the same ground, were held during 1977 and 1978 on the bill that became the ICWA.[ ] While much of the testimony again focused on the harm to Indian parents and their children who were involuntarily separated by decisions of local welfare authorities, there was also considerable emphasis on the impact on the tribes themselves of the massive removal of their children. For example, Mr. Calvin Isaac, Tribal Chief of the Mississippi Band of Choctaw Indians and representative of the National Tribal Chairmen's Association, testified as follows:

'Culturally, the chances of Indian survival are significantly reduced if our children, the only real means for the transmission of the tribal heritage, are to be raised in non-Indian homes and denied exposure to the ways of their People. Furthermore, these practices seriously undercut the tribes' ability to continue as self-governing communities. Probably in no area is it more important that tribal sovereignty be respected than in an area as socially and culturally determinative as family relationships.' 1978 Hearings, at 193.

*See also id.,* at 62. Chief Isaac also summarized succinctly what numerous witnesses saw as the principal reason for the high rates of removal of Indian children:

'One of the most serious failings of the present system is that Indian children are removed from the custody of their natural parents by nontribal government authorities who have no basis for intelligently evaluating the cultural and social premises underlying Indian home life and childrearing. Many of the individuals who decide the fate of our children are at best ignorant of our cultural values, and at worst contemptful of the Indian way and convinced that removal, usually to a non-Indian household or institution, can only benefit an Indian child.' *Id.,* at 191–192.[ ]

\* \* \*

The ICWA thus, in the words of the House Report accompanying it, 'seeks to protect the rights of the Indian child as an Indian and the rights of the Indian community and tribe

in retaining its children in its society.' House Report, at 23, U.S. CODE CONG. & ADMIN. NEWS 1978, at 7546. It does so by establishing 'a Federal policy that, where possible, an Indian child should remain in the Indian community,' *ibid.*, and by making sure that Indian child welfare determinations are not based on 'a white, middle-class standard which, in many cases, forecloses placement with [an] Indian family.' *Id.*, at 24, U.S. CODE CONG. & ADMIN. NEWS 1978, at 7546."

*Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32–37, 109 S.Ct. 1597, 1600–02, 104 L.Ed.2d 29 (1989). As a result of the 1977 and 1978 hearings, Congress incorporated the following findings into ICWA:

"(3) [T]hat there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children and that the United States has a direct interest, as trustee, in protecting Indian children who are members of or are eligible for membership in an Indian tribe;

(4) that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions; and

(5) that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families."

25 U.S.C. § 1901 (2000). *See also* 490 U.S. at 35–36, 109 S.Ct. at 1601.

The Adoption and Safe Families Act of 1997 (ASFA), Pub.L. No. 105–89, 111 Stat. 2115 (codified as amended at 42 U.S.C. § 1305 and scattered sections of the Social Security Act), in contrast, was designed to promote and hasten the adoption of children in foster care and to facilitate the removal of children from abusive families. *See In re Karl H.*, 394 Md. 402, 420 n.

15, 906 A.2d 898, 908 n. 15 (2006). The Maryland General Assembly implemented the provisions of ASFA to comply with federal law and secure the financial benefits of compliance in 1998.[5] 1998 Md. Laws, Ch. 539, *In re Karl H.* at 420–21, 906 A.2d at 908. The "main focus of the act was to accelerate the placement of foster children in adoptive homes." *In re Karl H.*, 394 Md. at 421, 906 A.2d at 909. The provision that "reasonable efforts shall be made to preserve and reunify families" mirrors an identical provision in ASFA. 42 U.S.C. § 671(a)(15)(B) (2006).

The ICWA and ASFA have different aims—the ICWA is concerned with creating a measured, and, as a result, potentially slower[6] process for separating an Indian child from the family, while ASFA is concerned with expediting the removal process when it proves necessary to achieve a higher level of permanency for children in out-of-home placements through adoption. Although ASFA contains no specific explanation of the interaction between the "reasonable efforts" standard it introduced and the provision for "active efforts" contained in the ICWA, ASFA provides that it "shall not be construed to affect the application of the Indian Child Welfare Act of 1978." 42 U.S.C.A. § 674(d)(4) (2009).

In *People ex rel. J.S.B., Jr.,* the South Dakota Supreme Court explained the difference between the ICWA and ASFA, taking into account their different historical underpinnings, as follows:

---

**5.** The Federal government, under ASFA, provided up to $6,000 per child to assist in increasing the number of adoptions of children placed out of the home. 42 USCA § 673b(d)(1)(A)-(B) (2003); William Wesley Patton and Amy M. Pellman, *The Reality of Concurrent Planning: Juggling Multiple Family Plans Expeditiously Without Sufficient Resources,* 9 U.C. Davis J. Juv. L. & Pol'y 171, 175 (2005).

**6.** The ICWA allows for a transfer of jurisdiction to tribal court, notification to the Indian tribe and an additional 20 days to prepare upon request by the tribe, and withdrawal of the parents' consent to voluntary placement or adoption, among other measures. *See* 25 U.S.C. §§ 1911(b), 1912(a), 1913(b)-(d) (2006). These special protections can cause the process of foster care placement or termination of parental rights to take longer than cases in which the ICWA does not apply.

"ICWA differs from ASFA in its means of promoting Indian children's best interests. ICWA ensures the best interests of Indian children by maintaining their familial, tribal, and cultural ties. It seeks to prevent capricious severance of those ties, whereas ASFA identifies permanency as a major consideration in promoting the best interests of children. A further distinction between the two acts ... is the requirement in ICWA that state agencies make 'active' efforts to provide services aimed at the prevention of a family break-up. ICWA provides no exception to this mandate. On the other hand, in an attempt to assist states in increasing the speed with which children might achieve the desired goal of permanency ... ASFA relieves states from making merely perfunctory remedial efforts in cases where a court has found that the parent has subjected the child to aggravated circumstances of abuse or neglect."

*People ex rel. J.S.B., Jr.*, 691 N.W.2d 611, 617 (S.D.2005). Noting that ASFA does not trump the ICWA, the South Dakota court continued:

"If it is perhaps open to question whether our Legislature understood the terms 'reasonable efforts' and 'active efforts' to be interchangeable, we do not think Congress intended that ASFA's 'aggravated circumstances' should undo the State's burden of providing 'active efforts' under ICWA. Three rules of statutory construction dictate otherwise. First, ICWA clearly offers no exception to its requirement of 'active efforts.' And ASFA does not mention ICWA, much less state that its exceptions to 'reasonable efforts' should apply to ICWA's 'active efforts. In fact, no provision in ASFA specifically purports to modify ICWA. It would seem illogical that ASFA would implicitly leave unchanged certain ICWA provisions, like notice to tribes, intervention, and transfer to tribal courts, while modifying others.

Second, the rules of statutory construction require that the more specific statute controls. As between the two acts, ICWA is the more specific. ICWA deals with a discrete segment of our population, Native American families, who

Congress found were best served by maintaining their relationships with their tribes and extended families.

* * *

Third, when interpreting a statute pertaining to Indians, the United States Supreme Court has stated, 'statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit. . . .' As Congress found when it enacted ICWA, it is to the benefit of Indian children to remain within their families and only after 'active efforts' to reunite those families have proven unsuccessful should the children be removed."

*Id.* at 619 (citations and footnote omitted).

The majority relies on the several states which held that "the federal 'active efforts' standard is essentially the same as the 'reasonable efforts' to 'preserve or reunify families' standard." Maj. Op. at 38–39 n. 1, 976 A.2d at 1042 n. 1. The better view however, supported by a majority of states that have considered this issue, and embraced by the Court of Special Appeals, as well as by the legislative intent underlying the ICWA, is that the "active efforts" standard differs from "reasonable efforts." See *Winston J. v. Dept. of Health and Soc. Servs.*, 134 P.3d 343, 347 n. 18 (Alaska 2006) (finding that the "active efforts" requirement is *"more demanding "* than the "reasonable efforts" requirement); *In re Interest of Sabrienia B.*, 9 Neb.App. 888, 621 N.W.2d 836, 842 (2001) (holding that "the ICWA requirement of 'active efforts' is *separate and distinct* from the 'reasonable efforts' provision") (emphasis added).

In *Winston J.*, 134 P.3d at 347 n. 18, the Alaska Supreme Court found that the ICWA's "active efforts" requirement is more demanding than the "reasonable efforts" required by the state statute. *See also Marina B. v. Alaska, Office of Children's Servs.*, 2009 WL 225711, 2009 Alas. LEXIS 5 (Alaska 2009). The Nebraska Court of Appeals in *Sabrienia B.*, 621 N.W.2d at 842, held that "the ICWA requirement of 'active efforts' is *separate and distinct* from the 'reasonable efforts' provision . . . and therefore requires the State to plead active

efforts by the State to prevent the breakup of the family." (Emphasis added). The court held that, because the State did not allege in its motion to terminate parental rights that active efforts had been made to reunify the Indian family pursuant to the ICWA, appellant's demurrer to the termination pleading should have been granted. *Id.*

In Iowa, by legislation, the federal standard of "active efforts" has been interpreted to mean something different than 'reasonable efforts,' and by statute, "[r]easonable efforts *shall not* be construed to be active efforts." Iowa Code § 232B.5(19) (2003) (emphasis added). The Iowa Code enumerates the steps that must be undertaken to comply with the "active efforts" requirement.

The fact that the "active efforts" requirement of § 1912(d) is not defined in the federal act makes it difficult for local departments to comply. Active efforts, at a minimum, require that reunification efforts be tailored to the family's status as an Indian family and must be designed to *"prevent the break-up of the Indian family."* § 1912(d). Offers of assistance must take into account the cultural differences that may effect utilization of resources, the availability of resources specifically tailored to Native American needs, and that "it is in the Indian child's best interest that its relationship to the tribe be protected." *Holyfield*, 490 U.S. 30, 50 n. 24, 109 S.Ct. 1597, 1609 n. 24. As a guide, the Department may consider the required steps set out in the Iowa Code, which are as follows:

"a. A request to the Indian child's tribe to convene traditional and customary support and resolution actions or services.

b. Identification and participation of tribally designated representatives at the earliest point.

c. Consultation with extended family members to identify family structure and family support services that may be provided by extended family members.

d. Frequent visitation in the Indian child's home and the homes of the child's extended family members.

e. Exhaustion of all tribally appropriate family preservation alternatives.

f. Identification and provision of information to the child's family concerning community resources that may be able to offer housing, financial, and transportation assistance and actively assisting the family in accessing the community resources."

Iowa Code § 232B.5(19).

Reading § 1912(d) to require culturally appropriate efforts to "prevent the breakup of the Indian family" gives full effect to the intent of ICWA without undermining the importance of finding a permanent placement for Indian children in a timely manner. This reading comports with guidelines issued ,for state courts by the Bureau of Indian Affairs in the wake of the passage of the ICWA, which state as follows:

"Any party petitioning a state court for foster care placement or termination of parental rights to an Indian child must demonstrate to the court that prior to the commencement of the proceeding active efforts have been made to alleviate the need to remove the Indian child from his or her parents or Indian custodians. These efforts shall take into account the prevailing social and cultural conditions and way of life of the Indian child's tribe. They shall also involve and use the available resources of the extended family, the tribe, Indian social service agencies and individual Indian care givers."

Bureau of Indian Affairs, Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed.Reg. 67584, 67592 (Nov. 26, 1979). The guidelines are nonbinding but persuasive, and confirm that the plain language of § 1912(d) provides that culturally appropriate "efforts" are required to prevent the breakup of the "Indian family." [7]

---

**7.** The Department argues that any departure from the "reasonable efforts" standard would require "unreasonable" or futile efforts to be expended. No one suggests that "active efforts" requires futile efforts. There will be some circumstances where "attempts at reunification would obviously be futile," and, in such cases "the Department need

The majority maintains that we need not consider the Juvenile Court's factual and legal findings in its Review and Order of Closure to assess whether the Department made "active efforts" in compliance with the ICWA. Rather, the majority posits, this Court should "examine the substance of the Department's and Circuit Court's actions" to determine if "active efforts" were made. Maj. Op. at 66–67, 976 A.2d at 1058. I disagree. The ICWA requires that a court make express findings that the Department has made "active efforts" in compliance with § 1912(d) to reunify the Indian family. The Juvenile Court's failure to do so in the case *sub judice* requires this case to be remanded to that court.

I agree with the view expressed by the Court of Special Appeals, noting as follows:

"We do not know exactly what additional services the Department could have provided. It may have been able to identify funds to help pay for the 'Another Way' methadone treatment, or offer other assistance to Ms. B. to deal with her substance abuse problem. Quite possibly, the 'active efforts' standard, under these circumstances, would require the Department to do more than just recommend a program. The 'active efforts' standard may also have required that the Department facilitate Ms. B.'s visitations with her children, which she said she could not make because she 'was hiding' in her house, possibly due to her panic disorder,

not go through the motions in offering services doomed to failure." *In re Adoption/Guardianship No. 10941*, 335 Md. 99, 117, 642 A.2d 201, 210 (1994). Even those jurisdictions that find "active efforts" to be a heightened standard compared to "reasonable efforts" do not require efforts that could be deemed futile. *See, e.g., E.A. v. State Div. of Family & Youth Servs.*, 46 P.3d 986, 991 (Alaska 2002) ("[a] parent's demonstrated lack of willingness to participate in treatment may be considered in determining whether the state has taken active efforts.") (alteration in original); *People ex rel J.S.B., Jr.*, 691 N.W.2d 611, 621 (S.D. 2005) (there is no requirement to "persist with futile efforts" where a father's whereabouts were originally unknown, he was later incarcerated, and he refused to participate fully in the alcohol treatment services which were offered to him). Requiring that the Department's efforts be tailored to the cultural context of the Indian family does not require the Department to expend futile efforts.

by having a social worker accompany her when she leaves her home for the visits.

Whether additional steps are required will depend not only on the particular facts of the case, but on what resources the Department has, a matter not addressed in this record. The burden is on the Department to demonstrate that a lack of resources prevented it from making more active efforts on her behalf. *See* 25 U.S.C. § 1912(d)."

*Id.* at 473, 927 A.2d at 1207–08.

Nowhere does the majority refer to the Juvenile Court's factual findings concerning efforts—reasonable or active—made by the Department and consider whether those findings were clearly erroneous. Rather, the majority cites "the record in this case" and renders its own finding that "the Department offered numerous services to both John B. and Wendy B." Maj. Op. at 69–70, 976 A.2d at 1060. In doing so, the majority substitutes its own judgment for that of the trial court on its findings of fact.

The majority concludes that we need not consider whether the Juvenile Court used the statutory label "active efforts" in its Review and Order of Closure, because "[t]he governing principle is that, in applying statutes, other enactments, pleadings, or legal principles, 'courts must ordinarily look beyond labels ... and make determinations based on ... substance.'" Maj. Op. at 65–66, 976 A.2d at 1058. This rule of appellate review has not been applied by this Court in reviewing child custody proceedings, and the majority misconstrues the string of cases that purportedly support it. Most of the cases the majority cites refer solely to construing pleadings. *In re Deontay J.*, 408 Md. 152, 160, 968 A.2d 1067, 1071 (2009), *Piven v. Comcast*, 397 Md. 278, 290, 916 A.2d 984, 991 (2007), *Alitalia v. Tornillo*, 320 Md. 192, 195, 577 A.2d 34, 36 (1990), *Korzendorfer Realty, Inc. v. Bufalo*, 264 Md. 293, 296, 286 A.2d 142, 144 (1972), and *Lapp v. Stanton*, 116 Md. 197, 199, 81 A. 675, 676 (1911), only apply to a *trial court's* consideration of a *pleading*. *See Deontay J.*, 408 Md. at 160, 968 A.2d at 1071 (noting "the well established principle 'that the sub-

stance rather than the form *of the pleading* is the controlling consideration' "); *Piven,* 397 Md. at 290, 916 A.2d at 991 ("courts must ordinarily look beyond labels and conclusory averments and make determinations based on the substance of the allegations of *a pleading); Tornillo,* 320 Md. at 195, 577 A.2d at 36 ("Ordinarily, 'magic words' are not essential to successful *pleading* in Maryland"); *Korzendorfer,* 264 Md. at 296, 286 A.2d at 144 ("The forms of *pleadings* which follow shall be sufficient and the like forms may be used with such modifications as may be necessary to meet the facts of the case, *but nothing herein contained shall render it erroneous or irregular to depart from said forms so long as substance is expressed"); Lapp,* 116 Md. at 199, 81 A. at 676 ("[T]he substance, rather than the form, of the *pleading* is the controlling consideration").

The remaining cases cited by the majority also do not support its theory that this Court must look to the substance of the Department's and Circuit Court's actions to divine the Circuit Court's purported legal conclusions and provide a basis for review. *See Murrell v. Baltimore,* 376 Md. 170, 195, 829 A.2d 548, 563 (2003) (considers the "substance" of a cause of action in determining the application of the non-appealability rule of Courts and Judicial Proceedings Article, § 12–302(a)); *Kant v. Montgomery County,* 365 Md. 269, 274, 778 A.2d 384, 387 (2001) (considering whether Md.Code, Courts and Judicial Proceedings Article, § 12–302(a) authorizes an appeal from a circuit court's judgment in reviewing the decision of an administrative agency); *Gisriel v. Ocean City Elections Board,* 345 Md. 477, 498–500, 693 A.2d 757, 768 (1997) (considering the "substance" of a cause of action in determining the application of the non-appealability rule of Courts and Judicial Proceedings Article, § 12–302(a)); *Gluckstern v. Sutton,* 319 Md. 634, 650–51, 574 A.2d 898, 906 (1990) (noting that a "motion to revise the judgment" was proper even though the motion was not clearly labeled as such); *Matter of Spalding,* 273 Md. 690, 703, 332 A.2d 246, 253 (1975) (noting that "labels are not controlling in determining the applicability of the Due Process Clause to juvenile proceedings").

This Court could not properly review the Juvenile Court's findings of facts as it related to "active efforts" or conclusions of law regarding "active efforts" made by the Department because the Juvenile Court did not make any such findings. As such, as the Court of Special Appeals mandated, this Court should vacate the closure of this case. The Circuit Court should evaluate whether, in light of all the circumstances and resources reasonably available to the Department, the Department made sufficient *active efforts* to facilitate and provide treatment for the B's.

The majority asserts that appellate courts applying the ICWA "generally examine the actual evidence in the case instead of requiring trial courts to use the phraseology of the federal statute." Maj. Op. at 66–67, 976 A.2d at 1058. To the contrary, the Juvenile Court was *required* to make explicit findings that the State made "active efforts" and complied with the ICWA before closing the CINA case before it. *In re Roe*, 281 Mich.App. 88, 764 N.W.2d 789, 795 (2008).

Section 1912(d) provides that "[a]ny party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall *satisfy the court* that active efforts have been made ... and that these efforts have proved unsuccessful." (Emphasis added). The plain language of the ICWA makes clear that the Department bears the burden of proving that "active efforts" have been made to prevent the breakup of the B. family and "that these efforts have proved unsuccessful." *In re Roe*, 764 N.W.2d at 795. Because the Department must "satisfy" the trial court that the "active efforts" were made and were unsuccessful, "in order 'to effect' the termination [of parental rights], the trial court had to find *specifically* that the Department had made active efforts and that these efforts were unsuccessful before it could proceed with the termination of ... parental rights." *Id.* (emphasis added).

The Juvenile Court made no evaluation of the efforts expended in this case under the "active efforts" analysis set forth above. The court did not mention "active efforts" in its

ruling from the bench or in its Review and Order of Closure. In its ruling from the bench, the court did not acknowledge the children's unique status as Indian children and as members of the Tribe in the context of the level or type of efforts made to reunify the family.

In its Review and Order of Closure, the Juvenile Court merely stated as follows:

"This Court hereby **FINDS** that **Reasonable Efforts** have been made by the Montgomery County Department of Health and Human Services (hereinafter the "Department") to achieve **Reunification with the Child's parents** as listed on page 2 of the Department's report dated July 12th, 2006 (copy attached)."

The Juvenile Court failed to evaluate the efforts made by the Department under the appropriate legal standard contained in § 1912(d), that of "active efforts ... to prevent the breakup of the Indian family." I would hold that the court erred as a matter of law by failing to apply the appropriate standard.

The CINA closure was premised upon an incorrect standard of law. The Department must provide services tailored to the family's status as an "Indian family" in order to satisfy the "active efforts" requirement of ICWA, and to state that active efforts have been made to prevent the break up of the Indian family.

Accordingly, I would affirm the judgment of the Court of Special Appeals reversing the trial court and remand the case back to the Juvenile Court to apply the proper legal standard in deciding whether the Department expended active efforts to keep the Indian family together.

Chief Judge BELL has authorized me to state that he joins in the views expressed in this dissenting opinion.